**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Louis SIMON, Defendant-Appellant.**

**No. 11867.**

United States Court of Appeals
Seventh Circuit.

Feb. 25, 1957.

Maurice Weinstein, Milwaukee, Wis., for appellant.

Edward G. Minor, U. S. Atty., Howard W. Hilgendorf, Asst. U. S. Atty., Milwaukee, Wis., for appellee.

Before DUFFY, Chief Judge, and MAJOR and SCHNACKENBERG, Circuit Judges.

MAJOR, Circuit Judge.

Defendant was tried by the court without a jury on an information which charged a violation of Title 26 U.S.C.A. §§ 2707(b), 3294(c), 3294(a) and 3287. Defendant was found guilty and a judgment was rendered thereon, from which he appeals.

The contested issues, agreed to by the parties, are: (1) Does the evidence show that defendant was engaged in the business of accepting wagers or that he accepted wagers within the terms of the statute? and (2) Does the evidence show that defendant's failure to comply with Sections 3287 and 3294 was willful so as to be subject to the penalties imposed by Section 2707(b)?

In view of the issues thus stated, the main statutory provision for considera-

tion is Sec. 3285(d), entitled "Persons liable for tax," which provides so far as here material:

"Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him."

The same section contains, among others, the following definition:

"The term 'wager' means (A) any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers * * *."

The statute contains no definition of the phrase, "the business of accepting such wagers."

Defendant urgently insists that the evidence is insufficient to sustain the conviction because it fails to prove that he was "engaged in the business of accepting such wagers." The evidence discloses that defendant maintained an office in Room 833, 152 West Wisconsin Avenue, in the City of Milwaukee, Wisconsin, under the name of Badger News Service, with six separate telephone lines, two of which, at his request, were not listed in the directory. He also had two telephones in his home at 1914 North Prospect Avenue, Milwaukee, one of which, at his request, was listed in a name other than his. Defendant also maintained in his office a Western Union Ticker, for which service he paid $64.00 monthly.

Defendant in his income tax return for the year 1953, the year covered by the charges contained in the information, showed a gross income of $13,840.00, and claimed deductions, among others, of $748.44 for Western Union service, and $3,239.05 for telephone service. Neither the source of such income nor his occupation was revealed by the return.

Defendant was interviewed by an agent of the Internal Revenue Service in March 1952, several months after the law in controversy became effective, in which interview he stated that he was aware of the law and knew what it covered. At the same time, he stated that he was not engaged in gambling activities but refused, upon request of the agent, to sign an affidavit so stating.

Government witness Kaplan testified that he was a sports handicapper with his place of business in Chicago, Illinois; that he had known and done business with defendant for many years, but mostly in 1952 and 1953; that during the year 1953 he supplied baseball and football handicap sheets to defendant and furnished him by telephone daily with quotations on the odds or the point handicaps. For this service he received from defendant, always by mail and in cash, $20.00 per week for baseball quotations and $25.00 per week for football quotations. Kaplan also testified that he visited defendant's office in December, 1955, where he observed a Western Union Ticker similar to that which Kaplan maintained in his office. He testified that at the time he visited defendant's office "there was nothing doing because it was off-season. Football had ceased."

Government witness Nordquist testified as to five bets of from $25.00 to $50.00 each, which he made with defendant during 1953, one on the train while going to Madison, two on baseball games (place of making bets not designated), and two at the ball park.

Government witness Yaffe testified that between May 10 and November 5, 1953, he made several bets with defendant; that he was not certain as to the number but that they were made over the telephone two or three times a week, and ranged from $10.00 to $50.00 each; that when he lost a bet he paid by personal check made out to cash. The government offered in evidence six checks signed by the witness, payable to cash, in amounts ranging from $100.00 to $200.00, dated between May 15 and October 15, 1953, which the witness testified were mailed to defendant. It is evident that Yaffe was an unwilling witness. On cross-examination he refused to state when the checks were mailed with reference to the date which they bore and admitted that it was possible that they were postdated and mailed in 1951, prior to the passage of the law in controversy.

On redirect examination, however, the witness reaffirmed his statement that the checks were mailed to defendant on account of bets made with him during 1953. It is of interest to note that these checks were paid by the bank and charged to the account of the witness without endorsement.

Absent a statutory definition of the word "business" as used in the statute, defendant cites and quotes from many cases which have construed its ordinary meaning. Without citing or discussing such cases, it is sufficient to note that they are summarized in defendant's brief as follows:

> "From the foregoing definitions it is clear that before the activities can be defined as a business, such activity must be one in which a person regularly and with continuity spends a great or major portion of his time, out of which he does or expects to earn his livelihood, or the purpose is for a profit, and that any enterprise or activity not conducted for a livelihood does not come within the ordinary meaning of the term 'business.' "

On this premise it is argued that because "there is no evidence from which it can be concluded that the few bets that the defendant made were for the purpose of a livelihood," it follows that defendant cannot be held to have engaged "in the business of accepting wagers."

The legislative history of the Act demonstrates that the premise is unsound and that the argument predicated thereon must fail. The report of the House Committee on Ways and Means with reference to the question under consideration states, U.S.Code, Congressional and Administrative Service, Vol. 2, 82nd Congress, First Session 1951, page 1839:

> "Wagers on sports events or contests, to be taxable, must be placed with a person engaged in the business of accepting such wagers. The purpose of this requirement is to exclude from tax the purely 'social' or 'friendly' type of bet. A per-

son is considered to be in the business of accepting wagers if he is engaged as a principal who, in accepting wagers, does so on his own account. * * * It is not intended that to be 'engaged in the business of accepting such wagers' a person must be either so engaged to the exclusion of all other activities or even primarily so engaged. Thus, for example, an individual may be primarily engaged as a salesman, and also, for the purposes of this tax, be engaged in the business of accepting wagers."

■ Thus, it appears plain that Congress did not employ the word "business" as it has been construed when used in a different environment. The purpose of the language "engaged in the business of accepting wagers" was to exclude from coverage of the Act only bets of the "purely 'social' or 'friendly' type." There is no indication that any other type of wager was excluded. Conversely, the language was intended to include wagers accepted by a principal on his own account, irrespective of whether he was primarily or only incidentally engaged in the acceptance of wagers.

■ We think application of the statute does not necessarily depend upon the number but upon the circumstances under which such wagers were accepted. We suppose that a person engaged in a legitimate business might make several wagers on a sports event which could well be characterized as social and friendly, particularly if they were made, as such wagers usually are, on sentiment or loyalty to a person or team rather than on the basis of posted odds. On the other hand, it would be difficult to similarly characterize the same number of wagers, or even fewer, accepted on posted odds by the same person, not engaged in any legitimate business. Particularly is that so where, as in the instant situation, defendant was not shown to have had any legitimate business and where he possessed all the paraphernalia essential to the operation of a gambling establishment. In this connection, we have not

overlooked defendant's argument that the telephones, the Western Union Ticker and the handicap sheets were used in the operation of the Badger News Service, or the argument that such equipment might be used by taverns, store keepers, newspapers and other businesses. Assuming such possibility, the short answer to the contention is that the record is devoid of any proof in its support.

As we have stated, we think application of the statute depends, at least to a considerable extent, upon the facts of each case. Furthermore, we think that the circumstances shown in the instant case lead to the irresistible conclusion that defendant was "engaged in the business of accepting wagers" and that he "accepted wagers," and that the District Court properly so found.

While we discern no relevancy to the contested issues as stated, defendant argues that the statute is not enforceable because of its vague and uncertain terms. A number of Supreme Court cases are cited which have held certain statutory provisions unconstitutional because of vagueness and uncertainty. We need not be concerned with such cases or with defendant's argument on this point because the constitutionality of the Act under consideration was sustained by the Supreme Court in United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754.

This brings us to the contention that defendant is not subject to the penalties imposed by Sec. 2707(b) because there is no proof that his failure to comply with the statute was willful. Defendant cites cases purportedly in support of the argument that "the word willful as used in a criminal statute means more than intentional or voluntary act, but includes an evil motive or bad purpose rather than a misconception of the law." The cases relied upon furnish only meagre, if any, support to the contention. Typical of such cases are United States v. Martell, 3 Cir., 199 F.2d 670, and Wardlaw v. United States, 5 Cir., 203 F.2d 884. In Martell, referring to willfulness as an essential element of the crime, the court stated, 199 F.2d at page 672:

"It is best defined as a state of mind of the taxpayer wherein he is fully aware of the existence of a tax obligation to the government which he seeks to conceal. A willful evasion of the tax requires an intentional act or omission as compared to an accidental or inadvertent one. It also requires a specific wrongful intent to conceal an obligation known to exist, as compared to a genuine misunderstanding of what the law requires or a bona fide belief that certain receipts are not taxable."

In Wardlaw, the issue of whether the defendant willfully attempted to evade income tax was submitted to the jury. The discussion of the court as to what constitutes willfulness is of no benefit to the instant defendant. The court stated, 203 F.2d at page 885:

"Claimed ignorance, however, could hardly be established so conclusively as to justify a directed verdict. It seems to be conceded that the appellant intentionally, though (he claims) mistakenly, failed to include a large part of his income in his return."

The court held that the intentional refusal to file a return presented an issue of fact as to whether the refusal was willful. The court stated, 203 F.2d at page 886:

"It was for the jury to say whether the appellant had the requisite criminal intent, that is whether he willfully and knowingly attempted to defeat and evade income tax."

This court, in United States v. Perplies, 7 Cir., 165 F.2d 874, considered and rejected the same contention as that advanced by the instant defendant as to the proof required on the issue of willfulness. In so doing we stated, 165 F.2d at page 876:

"In the instant case, the reason or motive for the overceiling sale is immaterial as long as the failure to comply with the regulation was in-

tentional and deliberate and not merely by inadvertence or mistake."

 Regardless, however, of the connotation which may be given to the word "willful," we think the proof was ample to support a finding against the defendant on this issue. Defendant had knowledge of the law and intentionally refused to comply. There is no proof that such refusal was in good faith. The circumstances surrounding defendant's activities as previously related, including the secrecy with which they were carried on, were sufficient to justify such finding. In fact, we think the finding was inescapable. In our view, the judgment of the District Court was proper. It is, therefore,

Affirmed.