**Edward LAMB**

v.

**Pat SUTTON and WSM, Incorporated.**

**Edward LAMB**

v.

**Pat SUTTON and WLAC, Incorporated.**

**Civ. A. Nos. 1925, 1936.**

United States District Court
M. D. Tennessee,
Nashville Division.

July 29, 1958.

930

Lewis S. Pope, Nashville, Tenn., and Albert Williams, Kenneth Harwell, Hugh Howser, of Williams, Harwell, Howser & Thomas, Nashville, Tenn., for plaintiff.

K. Harlan Dodson, Jr., and Tyree B. Harris, III (of Hooker, Keeble, Dodson & Harris), Nashville, Tenn., for defendant Sutton.

W. F. Barry, Nashville, Tenn., and Lindsey Davis, Edwin F. Hunt, Joseph G. Cummings (of Howard, Davis, Boult & Hunt), Nashville, Tenn., for defendant WSM, Inc.

Allen M. Steele, Nashville, Tenn., and Charles C. Trabue, Jr. (of Trabue, Sturdivant & Harbison), Nashville, Tenn., for defendant WLAC, Inc.

WILLIAM E. MILLER, District Judge.

The defendant Pat Sutton was a candidate for United States Senator in the primary election of the Democratic Party held in Tennessee in August 1954, opposing the incumbent Senator Estes Kefauver. In connection with his campaign the defendant Sutton conducted a so-called "talkathon" which was carried over the radio and television facilities of the defendants, WSM, Inc. and WLAC, Inc. The talkathon continued for an uninterrupted period of twenty-six and a half hours, beginning at 7:30 P.M. on

July 12, 1954, and concluding at 10:00 P.M. on July 13, 1954. Prior to this time Senator Kefauver had used the facilities of the defendant stations for political broadcasts in connection with his campaign and had contracted for time subsequent to the talkathon. However, the time purchased by defendant Sutton was in excess of the time requested or used by Senator Kefauver.

The actions were instituted by the plaintiff to recover damages from the defendant Sutton and the defendant broadcasting stations because of remarks made by Sutton during the course of the talkathon concerning the plaintiff which the plaintiff alleged to be libelous. In substance, the claim for damages was based upon the remarks of Sutton to the effect that the plaintiff was a known Communist and that his licenses to operate radio and television stations had been revoked by the Federal Communications Commission. The actions were tried to a jury and resulted in verdicts in favor of the plaintiff, in the amount of $15,000 against Sutton and WSM and in the amount of $10,000 against Sutton and WLAC.

■■ The defendant Sutton has filed a motion for a new trial upon the sole ground that the verdicts are excessive. In actions of defamation the wrong done to a plaintiff is peculiarly difficult to measure according to a money standard. And as pointed out in the early case of Saunders v. Baxter, 53 Tenn. 369, 384–385, the Court will not interfere unless the damages allowed by the jury are "unreasonable beyond measure". It is true that the jury verdict was limited to a finding that plaintiff was libeled by the remark that his licenses had been revoked. But considering the natural tendency of such a statement, if false, to do harm, its widespread dissemination over the facilities of the two broadcasting stations, and all the circumstances as developed by the proof, it would not be possible for the Court to say that the damages allowed are unreasonable.

■ The plaintiff testified that the defendant's statement alone had damaged

him both personally and in connection with his business enterprises, whereas in a previous District Court case, immediately prior to Sutton's statement, he had testified that the damage resulted from the Federal Communications Commission's letter setting a hearing on his application for renewal of licenses held by him. It is argued that these statements are totally inconsistent and, under the authority of Johnston v. Cincinnati, N. O. & T. P. R. Co., 146 Tenn. 135, 158, 240 S.W. 429, and other decisions of like import, cancel each other out and leave the record without evidence of special damage. However, there is ample evidence in the record, aside from the statements of the plaintiff as to the cause and extent of his damages, from which the jury could have concluded that he was in fact substantially damaged by the libelous remarks in question and upon which it could reasonably have predicated the allowance of the aggregate amount of $25,000. Consequently, the doctrine of Johnston v. Cincinnati, N. O. & T. P. R. Co., supra, is inapposite.

■ The defendants WSM and WLAC have moved the Court to set aside the verdicts in the actions and to enter judgment in their favor in accordance with their motions for directed verdicts made at the close of the evidence. The motions for directed verdicts are based upon the argument that under Section 315 of the Federal Communications Act of 1934, as amended, 47 U.S.C.A. § 315, defendant stations have a "privilege or immunity from suit for defamation based upon material broadcast by a legally qualified candidate for public office who was granted time after his opponent had been granted time."

Section 315 provides:

"(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship

over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate.

"(b) The charges made for the use of any broadcasting station for any of the purposes set forth in this section shall not exceed the charges made for comparable use of such station for other purposes.

"(c) The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section."

Thus no express provision in the section grants immunity to a licensee for defamatory remarks made by a candidate for public office during a political broadcast. But it would appear that such immunity is necessarily implied. Analyzing the language employed it is seen that a licensee is not required to grant broadcasting time to any of the candidates for a particular public office. However, if it elects to permit any candidate for public office to use its facilities, it must afford equal opportunities to all other candidates for the same office. If it does so elect to allow the use of its facilities in a particular political campaign, it has "no power of censorship over the material broadcast under the provisions of this section". The denial of the right of censorship is complete, including any portions of the material deemed by the licensee to be defamatory. If the licensee, as the section clearly provides, is deprived of all right or power to censor or to delete any portions of the material to be broadcast by a political candidate, it logically follows that it was the intention of Congress to immunize the licensee from liability for defamation arising from remarks made by such candidate while using its facilities. It cannot fairly be supposed that Congress meant to leave licensees exposed to a continued liability for defamation and at the same time to deprive them of the power to avoid such liability.

This interpretation of Section 315 was adopted by the Federal Communications Commission in a well-reasoned opinion in In re Application of Port Huron Broadcasting Co., 1948, 4 R.R. 1, in which case the Commission was dealing with the attempted censorship by the broadcasting company of the speech of the first candidate in a political race requesting the use of its facilities. In the course of its opinion the Commission stated:

"* * * Accordingly, we are of the opinion that the prohibition of Section 315 against any censorship by licensees of political speeches by candidates for office is absolute, and no exception exists in the case of material which is either libelous or might tend to involve the station in an action for damages. In reaching this conclusion, however, we hold merely that the censorship prohibited under Section 315 of the Communications Act includes the refusal to broadcast a speech or part of a speech by a candidate for public office because of the allegedly libelous or slanderous content of the speech. Nothing in this opinion is intended to indicate that a licensee is necessarily without power to prevent the broadcast of statements or utterances in violation of the provisions of the Communications Act or any other federal law on broadcasts coming within the requirements of Section 315 of the Communications Act.

"The argument has been advanced that such an interpretation of the Act cannot be correct, because it would leave the licensee in the completely untenable position of being forbidden to censor political speeches containing libelous or other actionable material and, at the same time, subject to damages for any libelous or actionable material in such broadcasts. But this argument not only has no basis in the legislative history of the Section as explained above, but is based on an assumption of the licensee's liability for the remarks made by political candidates speaking under the sec-

tion which we do not believe is tenable. For as we read the provisions of Section 315, the prohibition contained therein against censorship in connection with political broadcasts appears clearly to constitute an occupation of the field by federal authority, which, under the law, would relieve the licensee of responsibility for any libelous matter broadcast in the course of a speech coming within Section 315 irrespective of the provisions of state law."

■ The legislative history of Section 315, fully set forth elsewhere in the Port Huron opinion, lends support to the conclusions reached by the Commission as to the absolute character of the no-censorship mandate of Section 315. Significant also is the fact that Congress has not, after the interpretation of Section 315 by the Commission in the Port Huron case, enacted statutes supplanting or modifying the section or its interpretation by the Commission. In 1948 a select committee of the House opened hearings and gave consideration to the Port Huron decision. Following the hearing the committee made no legislative recommendations with respect to Section 315, a strong indication that there is no general disagreement on the part of Congress with the construction adopted by the Federal Communications Commission. See In Matter of WDSU Broadcasting Corp., 1951, 7 R.R. 769.

In a recent decision the Supreme Court of North Dakota in Farmers Educational and Cooperative Union of America, North Dakota Division v. WDAY, Inc., 89 N.W.2d 102, 109, decided April 3, 1958, has construed the censorship provision of Section 315 to grant immunity to a station for libelous material used by a candidate for public office. In that case the court stated:

"There is no ambiguity in Section 315, supra. It provides in clear and specific language that where candidates for political office are permitted to use the facilities of a station such station 'shall have no power of censorship.' There are certain ex-

ceptions 'and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, and libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite to an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' Beauharnais v. People of State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 730, 96 L.Ed. 919.

"In the instant case the defendant WDAY was required by Section 315 to permit the broadcast of the Townley speech. Power to censor the speech was denied by the clear and specific language of Section 315. We cannot believe that it was the intent of Congress to compel a station to broadcast libelous statements and at the same time subject it to the risk of defending actions of damages.

\* \* \* \* \* \*

"When Congress enacted Section 315 it recognized the convenience and necessity of the general public and its right to information relative to political issues, the qualifications of candidates for public office, and their attitude on questions of grave importance affecting the general welfare of the state and nation.

\* \* \* \* \* \*

"The plaintiff contends that if said Section 315 is held to grant immunity to the defendant WDAY it would be unconstitutional and in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States. To this we cannot agree. Section 315 imposes a mandatory duty upon broadcasting

stations to permit all candidates for the same office to use their facilities if they have permitted one candidate to use them. Since power of censorship of political broadcasts is prohibited it must follow as a corollary that the mandate prohibiting censorship includes the privilege of immunity from liability for defamatory statements made by the speakers. In fact the maxim 'res ipsa loquitur' applies to the situation presented here. There is no provision in the Fifth and Fourteenth Amendments to the Constitution which prohibits Congress from either granting or denying a privilege. As we have pointed out elsewhere in the opinion, the manifest purpose of Congress in enacting Section 315 was to afford full opportunity to candidates for political office to give to the electorate and the public generally facts relative to their qualifications and fitness for the office to which they aspire."

■ A contrary ruling was made by the Supreme Court of Nebraska in Sorensen v. Wood, 123 Neb. 348, 243 N.W. 82, 85, 82 A.L.R. 1098, in which the court construed Section 18 of the Radio Act of 1927, the forerunner of Section 315, and containing an identical censorship provision. The Nebraska Supreme Court rejected the theory of immunity, construing the censorship clause as preventing "the licensee from censoring the words as to their political and partisan" trend but not as giving the licensee any privilege to join and assist in the publication of a libel nor as granting any immunity from the consequences of such action. But the basis for such a distinction cannot be found in the language of Section 315 itself nor has any reference been made to the legislative history of the enactment to support it. It would appear to be in conflict with the clear purpose of Congress as expressed in Section 315 and as demonstrated by legislative history to deny to broadcasting stations any right to exercise control or

censorship over the speeches of candidates for public office. It was evidently the belief of Congress that the denial of such right of censorship would contribute to the free and untrammeled discussion of public issues and would subserve the public interest. The ruling of the Nebraska Supreme Court would seriously impair the efficacy of the interdict against censorship and would introduce a distinction based upon the so-called partisan trend of the words which would be practically impossible to apply with any fair degree of certainty. The Court is of the opinion that Congress under the Federal Communications Act of 1934, as amended, completely occupied and preempted the field of interstate communications in radio and television, and that from the censorship provision in Section 315 and other regulatory provisions of the Act, there results by necessary implication an immunity of a broadcaster from liability for defamatory material broadcast by a legally qualified candidate. Cf. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; O'Brien v. Western Union Telegraph Co., 1 Cir., 113 F.2d 539.

■ The plaintiff argues that even if Section 315 does grant to licensees immunity from defamatory statements in political broadcasts the section is inapplicable in the present case for a number of reasons. First, it is insisted that the defendants have failed to show that they were licensees at the time they entered into the broadcast agreements or at the time of the talkathon. Concededly no direct evidence was offered to show that the defendants WSM and WLAC held licenses from the Federal Communications Commission to operate radio and television stations at the time the agreements were entered into or at the time of the broadcast. Nevertheless the Court is of the opinion that this insistence of the plaintiff cannot prevail. The stations could not have been legally operated without licenses from the Federal Communications Commission. A presumption ordinarily prevails, in the ab-

sence of proof to the contrary, that the law has been complied with. In the present case there is evidence that the defendants maintained and operated in Nashville large radio and television stations, broadcasting their programs over a wide territory. From the testimony adduced it is also a necessary conclusion that the stations had been operating prior to the talkathon in question for a considerable period of time. It cannot be supposed that two stations of such size and magnitude would have been permitted to operate for a prolonged period unless they had been duly authorized and licensed by proper authority. These facts coupled with the presumption of legal compliance are alone sufficient to dispose of this contention of the plaintiff. But in addition the issue as to whether the stations were duly licensed at the time of the broadcast would appear to have been removed from the case by the pleadings. Both complaints allege that the corporate defendants hold licenses issued by the Federal Communications Commission to operate their respective stations. This allegation is admitted by the answer of WLAC, and is in effect admitted by the answer of WSM.

The Court cannot agree that these allegations refer alone to the time when the respective pleadings were filed in Court as argued by the plaintiff. On the contrary, the pleadings when construed in their entirety, would appear to refer to the period of time which would give them meaning and significance in the case, that is, to the period when the broadcast agreements were entered into and when the defamatory remarks were uttered and broadcasted. To the extent that the decision in Weiss v. Los Angeles Broadcasting Co., 9 Cir., 163 F.2d 313, can be construed to support the plaintiff's position in this respect, the Court is convinced that it is unsound and should not be followed.

 Plaintiff further contends that Section 315 does not apply unless all candidates involved are legally quali-

fied candidates according to state law and that there is no evidence to show either that defendant Sutton or Senator Kefauver was a legally qualified candidate. The applicable statute in Tennessee, T.C.A. § 2–811, provides that the name of a candidate shall not be printed upon the official ballot used in a primary unless sixty days before such primary a nominating petition shall have been filed with designated authorities. There is no direct evidence that all of the required steps were taken to qualify either candidate in the primary, but the fact that both candidates were legally qualified at the time of the broadcast otherwise clearly appears from the record. The defendant Sutton testified that his name was on the ballot and at another point in his testimony he stated the number of counties he had carried and the number of counties carried in the primary by Senator Kefauver. It thus appears that the names of both candidates were upon the ballots used in the primary. In such circumstances there is a strong legal presumption that public officials performed their duty in placing the candidates' names upon the official ballots pursuant to law and after compliance with all legal requirements. Manis v. Farmers Bank, 170 Tenn. 656, 98 S.W.2d 313. The broadcast involved in these cases occurred on July 12, 1954, and was contracted for on July 9, 1954, both of which dates were within sixty days prior to the primary election held on the first Thursday in August 1954. There can be no question therefore that the defendant Sutton and Senator Kefauver were legally qualified candidates at the time the talkathon was broadcast.

. Plaintiff's third contention is that Section 315 is applicable only when candidates seek "equal opportunities". The basis of the argument is that when a candidate requests and is granted more time than that first requested and allowed to another candidate, the "equal opportunities" provision of Section 315 has not been complied with. In such event it is argued that the station has made an

election not to rely upon the immunity provided for by that section. The Court cannot agree that this is a correct interpretation of the section. Section 315 merely requires that the opportunity shall be equal, in effect providing that there shall be no discrimination against any candidate. Each candidate must be afforded or given the opportunity to have the same amount of time as any other candidate if he so desires or requests it. The purposes of the statute would be seriously curtailed and frustrated if its application depended upon an exact division of time between the respective candidates in a political race.

Finally it is the plaintiff's position that Section 315 does not apply and that the radio or television station involved is not entitled to immunity unless it was compelled to enter into the broadcast agreement as a result of Section 315. The predicate of this argument is the use of the words "under the provisions of this section" in the censorship clause. Plaintiff argues that the proof shows in the case that the time allowed to defendant Sutton was not allowed under the provisions of Section 315 but was allowed for the selfish purposes of the defendant stations. It is further insisted that the testimony shows that the talkathon agreement was not entered into with Sutton as a result of Section 315 but because it was station policy to grant time to any candidate for public office. The argument proceeds on the false premise that Section 315 applies only when it is specifically invoked in some way either by a candidate requesting time or by the station involved. It is altogether clear as pointed out that the Federal Communications Act occupies and regulates the field of interstate radio and television communications. Equally clear is the proposition that Section 315 occupies the field of political broadcasts made by candidates for public office and that it was intended to apply and govern notwithstanding the wishes of the parties affected. The words "under the provisions of this section" in the censorship clause are merely words of description and ref-

erence and not of limitation. The statute applies proprio vigore.

An order will be submitted overruling the motion of the defendant Sutton and sustaining the motions of defendants WSM and WLAC.