Ben **GENNARO**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

**No. 18318.**

United States Court of Appeals
Eighth Circuit.

Dec. 1, 1966.

Robert J. O'Hanlon, St. Louis, Mo., for appellant. Richard L. Daly, St. Louis, Mo., with him on brief.

Stephen H. Gilmore, Asst. U. S. Atty., St. Louis, Mo., for appellee. Richard D. FitzGibbon, Jr., U. S. Atty., and John A. Newton, Asst. U. S. Atty., St. Louis, Mo., on brief.

Before VOGEL, Chief Judge, GIBSON, Circuit Judge, and REGISTER, District Judge.

REGISTER, District Judge.

By this appeal Ben Gennaro seeks reversal of a judgment of conviction entered upon a jury verdict finding him

guilty on two counts of an information charging violations of federal statutes imposing a tax on persons engaged in the business of accepting wagers. We affirm the judgment as entered by the district court.

Appellant was charged in count one of the information with being " * * * willfully and knowingly engaged in the business of accepting wagers as a bookmaker * * * " during the taxable year ending June 30, 1965, " * * * without having paid the occupational tax imposed by Section 4411, Title 26, United States Code," in violation of Section 7262 of that title. Section 4411 imposes " * * * a special tax of $50 per year to be paid by each person who is * * engaged in receiving wagers * * * " Section 7262 provides, generally, for a penalty in the form of a fine to be imposed on a person found to be in violation of said Section 4411.

Count two of the information charged appellant with having " * * * willfully and knowingly engaged in the business of accepting wagers as a bookmaker while willfully and knowingly failing to pay the occupational tax imposed by Section 4411, * * * " during the taxable year ending June 30, 1966. Section 7203, Title 26, United States Code, provides for certain penalties, including fine or imprisonment, or both, to b ɔ imposed upon a person convicted of willfully failing to pay the tax described in Section 4411.

Appellant was sentenced to pay a fine of $1,000 on count one, and to imprisonment for a period of six months, together with a fine of $1,000, on count two.

No evidence was offered during the trial on behalf of the defendant; all the evidence received was offered by the appellee and stands uncontroverted.

The evidence consists of the testimony of two special agents of the Intelligence Division, United States Internal Revenue Service (Agents Wallace and Offutt); the testimony of Miss Bernice McDonald, an employee of Internal Revenue Service and custodian, in the St. Louis office, of records reflecting payment of wagering

tax stamps; and a number of exhibits. The record reveals the following facts:

Appellant operated Benny's Bar at 1028 Chouteau Street in St. Louis, Missouri. On June 3, 1965, Agent Wallace telephoned the bar, identified himself as "John from the Post," and asked for Benny. The person answering identified himself as Benny and during the ensuing conversation Agent Wallace placed nine wagers on horses running at various tracks on that day. The following morning Agent Wallace went to the bar, asked for appellant, identified himself as "John from the Post," and gave to appellant $20 which he owed as a result of the bets placed on the preceding day. He also gave to the appellant $100 in cash as a deposit for future wagers. During this conversation discussion was had concerning the time at which telephone calls should be made in the future, and the correct telephone number. Appellant introduced Agent Wallace to Bob Williams, one of appellant's bar employees, and told Wallace that if he (appellant) was not present at the bar when called, to place any bets with Williams. Thereafter appellant showed Agent Wallace around the bar, kitchen and storeroom, and while in the storeroom appellant answered two telephone calls during which he made notations of names, letters and numbers on a pad. Commencing on June 5, 1965, and continuing through that month, Agent Wallace placed numerous bets with the appellant or with Williams, at the bar. Between June 5 and July 23, 1965, Agent Wallace placed bets with the appellant covering more than 24 different horses and involving at least $170.

On June 17, appellant informed Agent Wallace that he (appellant) was obtaining football parlay cards for the fall season and could supply them to Wallace for five cents each.

On August 16 Agent Wallace called appellant from Iowa and placed a bet on a baseball game. During that conversation Wallace asked the appellant if he had purchased a wagering tax stamp. Appellant replied by stating " * * * no, he hadn't; that the stamp was only

$50.00; it was worth it to keep the 'Feds' off your back, but the minute you bought one, the State knew what was going on."

Agent Wallace placed wagers with appellant on August 20 and again on October 4. In response to appellant's request Agent Wallace met with him during the evening of October 4. At that meeting appellant advised Wallace " * * * that he was able to purchase the line or the point spread on football teams through a source out of Chicago if we wanted to buy the line and have our cards printed * * * ", informed Wallace regarding details of the operation—concerning cost of the cards, sources thereof, details of their delivery —and that appellant " * * * had maybe fifteen or twenty people lined up that would push or distribute the cards for us. They would draw fifteen per cent of the gross and we would split the net wins." Appellant proposed on this evening that he and Agent Wallace go into business together, on a partnership arrangement, and quoted a price of $2,-500 for a one-half interest. Wallace replied that he would think it over and talk with him later. Agent Wallace continued to place wagers with the appellant from time to time, the last occasion being on October 20, 1965.

Agent Offutt testified that on November 12, 1965, he entered Benny's Bar with a search warrant, identified himself, executed the warrant, informed appellant of his constitutional rights, and, after making the required search, arrested the appellant. In response to his question of "Where is your Federal Gambling Stamp", appellant replied that he did not have one and, when asked "Why not?", advised Agent Offutt that he did not need one. During the search Agent Offutt discovered and seized various documents, all received in evidence, and identified as gambling or wagering paraphernalia.

Miss McDonald testified that she was one of those persons having supervision of wagering tax stamp records of the Internal Revenue Service in its St. Louis district office; that she had searched

and examined the records for the fiscal years ending June 30, 1965 and 1966; and that there was no record of a federal wagering tax stamp having been issued to appellant for either of those two years.

The pertinency of the somewhat detailed statement of the evidence becomes apparent in considering the points of error raised by the appellant.

Appellant urges that the trial court erred in failing to give his requested instructions numbers 2 and 5, as submitted by him. The court eliminated a portion of each, and gave the remainder. Instructions 2 and 5, as requested by the appellant, are quoted; the portions eliminated by the trial court are in Italic print:

"Instruction No. 2: The tax involved in this case is what is known as an 'occupational tax'. The term 'occupation' is synonymous with calling, trade, business or profession. 'Occupation' as commonly understood signified the business or activity in which a person engaged *in order to secure a living or to obtain wealth.*

"Instruction No. 5: Unless you find and believe from the evidence beyond a reasonable doubt that the defendant Ben Gennaro *had a proprietary interest in the bookmaking operation and that he* was engaged in bookmaking as an occupation you must find the defendant Gennaro not guilty on Counts I and II of the indictment (sic)."

Appellant argues that the omitted portions of his requests were essential in order that the term "occupation", as used in the statute, be properly defined, and further, that " * * * a finding of a 'proprietary interest' was part of the law of the case." Appellant's brief, p. 6. It is his contention that only by including the portions omitted would the jury have been given " * * * a proper standard by which to determine whether he was 'engaged in the business of accepting bets' as contemplated by the statutes."

The gist of the charge contained in the first count, and one of the

essential elements of the crime charged in the second count of the information, is that appellant was, during the critical periods, willfully and knowingly "engaged in the business of accepting wagers" without having paid the required tax. It was proper, upon appellant's request, for the trial court to instruct the jury that the tax involved was what is known as an occupational tax and to define the term "occupation". The trial court in this case did just that, and instructed that it " * * * is synonymous with calling, trade, business or profession. 'Occupation' as commonly understood signified the business or activity in which a person is engaged." In Bohn v. United States, 8 Cir., 260 F.2d 773, a case in which the appellant was charged, tried and convicted of attempting to evade and defeat wagering excise taxes, error was urged in that the trial court did not give the jury a definition of the words "a person engaged in the business of accepting such wagers." The appellant had not submitted a request for such definition, but this court stated, by Judge Woodrough, at page 778: " * * * we are not persuaded that the court was required to do so. The word 'business' and the phrase 'engaged in business' are of common usage and there is no reason to treat jurors as though they were unfamiliar with them. The question whether appellant was 'engaged in the business' as charged in this case was a question within ordinary understanding of a taxpayer or of a juror." (Citations.) Also see: Ramsey v. United States, 9 Cir., 245 F.2d 295, 297.

■ By instruction number 5 the trial court specifically advised the jury members that unless they found beyond a reasonable doubt that the appellant was engaged in bookmaking as an occupation they must find him not guilty of the charges set forth in the information. A definition of the term "occupation" had previously been given in instruction number 2. Appellant would have the trial court go further and add an additional element to that required by the statute, namely: *"and* had a proprietary interest in the bookmaking operation." The record reveals substantial, credible and undisputed evidence that appellant did have a proprietary interest in the bookmaking operation. It may very well be that, had appellant's counsel informed the trial court of the specific reason why he desired the omitted portion to be given, it would have done so. However, it is our view that the omitted clause was not essential to the instructions, and no error was committed by the omission thereof.

In support of his contentions, counsel for appellant cites authorities to the effect that accepting a single wager does not make one subject to the special tax; that the wagering tax is not intended to cover pools operated at a loss; and that bets of a social or friendly nature are not to be taxed. He argues that instructions 2 and 5, as requested, " * * * aimed at these distinctions and were a part of the law of the case upon which the jury should have determined its verdict." Appellant's brief, p. 8. We agree that the cases cited support the propositions advanced by appellant. However, we have thoroughly examined the record and transcript of evidence in this case and find absolutely no evidence supporting, either directly or by inference, a contention that the wagers placed with appellant were of a social or friendly type, or that his wagering operation was intended to be conducted at a loss, or that he had accepted only a single wager. To the contrary, the evidence undisputably discloses that appellant's wagering activities were not limited to accepting a single bet; that they were not intended to be conducted at a financial loss; and that they were not of a purely social or friendly type, but were in fact commercial in nature.

The appellant in United States v. Simon, 7 Cir., 241 F.2d 308, asserted that because there was no evidence from which it could be concluded that the few bets he made were for the purpose of making a livelihood, he could not be deemed to have been engaged in the business of accepting wagers. In rejecting

that contention the court therein stated (p. 310):

"The legislative history of the Act demonstrates that the premise is unsound and that the argument predicated thereon must fail."

And, further:

"The purpose of the language 'engaged in the business of accepting wagers' was to exclude from coverage of the Act only bets of the 'purely "social" or "friendly" type.' There is no indication that any other type of wager was excluded. Conversely, the language was intended to include wagers accepted by a principal on his own account, irrespective of whether he was primarily or only incidentally engaged in the acceptance of wagers."

Appellant bases much of his argument upon the reasoning found in United States v. Calamaro, 354 U.S. 351, 77 S. Ct. 1138, 1 L.Ed.2d 1394, wherein the Supreme Court held that a "pick-up man" employed in operating a numbers game, who had no proprietary interest in the enterprise and who acted merely as a messenger in transmitting records of wagers from the "writer" to the "banker," was not "engaged in receiving wagers for or on behalf of any person" within the meaning of the pertinent statute. The court specifically noted that the "pick-up man" merely received the *records* of the wagering transaction from the person who had received the wager and transmitted them to the "banker." Hence, it is, in that type of case, the "writer" and not the "pick-up man" who is "engaged in receiving wagers" within the statutory meaning. The court further noted that the "pick-up man" merely acted as a messenger, received for his services a weekly salary and had no proprietary interest in the wagering enterprise. However, we find no merit to the claim that *Calamaro* supports an inference or conclusion that the existence of such an interest is an essential element of the offense, and that the Government has the burden of proving such interest beyond a reasonable doubt. The court, after considering the legislative

history of the statute involved and the contentions of counsel, concluded, at page 357, 77 S.Ct. at page 1142:

"The fact remains, however, that Congress did not choose to subject all employees of gambling enterprises to the tax and reporting requirements, but was content to impose them on persons actually 'engaged in receiving wagers.'"

An examination of United States v. Magliano et al., 4 Cir., 336 F.2d 817, also cited by appellant, discloses that the term "proprietary interest" was therein discussed, but in a manner similar to that in *Calamaro*, supra, and does not support his argument made here.

In Wright et al. v. United States, 8 Cir., 175 F.2d 384, the late Judge Sanborn, speaking for a majority of this court, stated, in part (p. 388):

"We have examined the requests and the charge of the court. The charge we consider entirely accurate, adequate, and eminently fair. Fortunately, a trial judge, in formulating his charge, is entitled to use his own language and is not required to let counsel for either party put words into his mouth. If the charge is accurate and gives to the jury all of the law which it needs in order to reach a verdict, that is enough. A charge should be a concise statement of the claims of the parties, the issues of fact which the jury must decide, and the applicable law."

Having examined the trial court's instructions to the jury in this case, we find them to be "entirely accurate, adequate, and eminently fair."

Appellant strongly urges that the trial court erred in failing to direct a verdict in his favor, with respect to the second count of the information, at the conclusion of the Government's case, for the reason that there is no evidence that his failure to pay the required tax was a "willful" failure.

The pertinent part of the statute involved (Section 7203, Title 26, U.S.C.) provides that "Any person required

\* \* \* to pay any \* \* \* tax \* \* \* who willfully fails to pay such \* \* \* tax \* \* \* shall \* \* \* be guilty of a misdemeanor \* \* \* " Appellant contends that even though the evidence in this case was uncontroverted, it was insufficient to support a finding by the jury that his failure to pay the required tax was "willful", as that term is used in the statute. It is his position that "willful" means more than an intentional or voluntary act; that it includes an evil motive or bad purpose directed toward defeating the requirements of the internal revenue laws.

In support of his asserted proposition concerning the correct interpretation of "willful" as used in the statute, appellant cites United States v. Calamaro, supra; Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418; United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Edwards v. United States, 5 Cir., 321 F.2d 324; United States v. Palermo, 3 Cir., 259 F.2d 872; Bloch v. United States, 9 Cir., 221 F.2d 786; and United States v. Martell, 3 Cir., 199 F.2d 670.

In *Palermo*, supra, the primary issue was the proper standard to be applied in determining "willful" failure to pay income taxes at the time or times required by the applicable sections of the Internal Revenue Code. That court, in its opinion, carefully considered and referred in some detail to *Spies, Murdock, Martell*, and *Bloch*, supra. With reference to the proper standard of "willfulness" to be applied therein, the court stated, in part: "Willfulness is an essential element of the crime proscribed by § 145(a). It requires existence of a specific wrongful intent—an evil motive—at the time the crime charged was committed \* \* \*." In *Edwards*, supra, that court used the following language: " \* \* \* this court has long held that, where the statutory definition of the crime of failure to pay a tax includes the element of willfulness, 'a specific wrongful intent, that is, actual knowledge of the existence of obligation and a wrongful intent to evade it, is of the essence.' " The Court, in *Martell*, supra, in considering the element of "willfulness" as contemplated by the statute, said (199 F.2d p. 672): "A willful evasion of the tax requires an intentional act or omission as compared to an accidental or inadvertent one. It also requires a specific wrongful intent to conceal an obligation known to exist, as compared to a genuine misunderstanding of what the law requires or a bona fide belief that certain receipts are not taxable." In general, appellant's position with reference to the standard to be applied, finds support in the cited cases. Thus, in this case, in which the appellant concedes that the undisputed evidence established his liability for the subject tax, knowledge of the federal taxing requirements and of his obligation, and his intentional failure to pay, the question before us is whether the evidence supports the jury's finding that such failure was willful, when the proper standard has been applied thereto. Are there factors present in the evidence which, directly or by inference, establish the "evil motive," "specific wrongful intent" or "bad purpose"—requisite elements of "wilfulness" as used in the statute?

■ Appellant insists that the only evidence bearing on this point is the "direct evidence" consisting of his reply to Agent Wallace's inquiry as to whether he had a wagering stamp; that is, that he did not have a stamp, that it was worth the purchase price of the stamp ($50) to keep the "Feds" off his back, but the minute he would buy one, the state knew what was going on. Appellant contends that this evidence establishes that his only motive in failing to obtain the federal stamp was to prevent the State of Missouri from learning of his wagering activities. While such evidence does indicate that appellant's failure to purchase the federal wagering stamp was motivated by a desire to conceal his bookmaking activities from state authorities, it does not conclusively establish that this was his *only* motive. In Spies, supra,

317 U.S. at page 499, 63 S.Ct. at page 368, the court stated:

"If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime."

And, in Magliano, supra, 336 F.2d at pages 820–821, the court said:

"It may well be that Trotta's failure to procure the tax stamp and comply with the federal revenue laws was motivated primarily by fear of criminal prosecution under state statutes, but a finding of willfulness does not depend upon a determination of predominant motivation. * * * Evidence of knowledge of the requirements of the taxing statutes, combined with proof of failure to pay the tax * * * furnishes a basis for a finding of willfulness."

Furthermore, it is clear that the "direct evidence" referred to by appellant is not the *only* evidence bearing on the issue of his willfulness, but that there exists in the record a substantial amount of circumstantial evidence which merited consideration.

In Wilson v. United States, 9 Cir., 250 F.2d 312, 325, a case in which the court had under consideration the meaning of the term "willful" as used in a criminal revenue statute, is found the following language:

"Whether particular conduct is 'willful' is, of course, a question of fact. By its very nature, it is not generally amenable to direct proof and must be shown by circumstantial evidence."

We deem it unnecessary to quote specific portions of the evidence, but, in general, we note those portions thereof which showed the furtive manner in which the wagering relationship between appellant and Agent Wallace was formed, the appellant's handling of his wagering transactions in such a manner as " * * * to avoid making the records usual in transactions of the kind, * * * *", his denial of tax liability and obligation to Agent Offutt, and other affirmative acts and conduct of appellant in the course of his wagering business, " * * * the likely effect of which would be to mislead or to conceal" (Spies, supra, 317 U.S. p. 499, 63 S.Ct. p. 368) its nature and existence from the federal authorities as well as from the state officials. Moreover, such circumstantial evidence is not necessarily outweighed by the "direct evidence" referred to.

"The argument is also made that circumstantial evidence should not be permitted to outweigh direct evidence. There is, however, nothing magical or sacrosanct about direct testimonial evidence as opposed to circumstantial evidence, especially when it comes from one who is implicated by the circumstances in the * * * (activity) * * * he seeks to deny." United States v. Gordon, 3 Cir., 242 F.2d 122, 126.

The inferences were for the jury. We are satisfied that the jury could have found (and did so find) that certain affirmative acts and conduct of the appellant, as disclosed by the evidence, reasonably supported an inference of willfulness and that such acts and conduct were prompted in part, at least, by tax evasion motives. Further, we are satisfied from our examination of the record in this case that this issue was properly submitted to the jury and that appellant's guilt " * * * has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts." Bollenbach v. United States, 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350.

Affirmed.