**UNITED STATES of America,**
**Libelant,**

**v.**

**$1,963 IN UNITED STATES MONEY,**
**Respondent**

[Matthew J. Robinson, Claimant].

**Civ. A. No. 4700.**

United States District Court
E. D. Tennessee, S. D.

March 29, 1967.

John H. Reddy, U. S. Atty., Robert A. Scott, Asst. U. S. Atty., Chattanooga, Tenn., for libelant.

Carter Schoolfield, Chattanooga, Tenn., for respondent.

## MEMORANDUM OPINION

NEESE, District Judge.

This is a proceeding by the libelant for the enforcement of a forfeiture to the United States, 26 U.S.C. § 7302, of certain currency seized by federal revenue agents from the person of the claimant Matthew J. ("Squirrel") Robinson and allegedly then possessed by Mr. Robinson when he had used or intended to use same in violating 26 U.S.C. §§ 4411 and 4412.[1]  The evidence was received by the Court without a jury on January 27, 1967.

---

1. § 4411 imposes a special tax on the business of accepting wagers.  § 4412 requires gamblers to register.  26 U.S.C. § 4401 levies a 10% tax on wagers.

398

■ Mr. Robinson admitted under oath that he was in the business of accepting wagers[2] without having purchased the requisite wagering stamp or registering as a gambler at the time the aforesaid currency was seized from him following a search on authority of a search warrant. He claimed, however, that all of the currency thus seized had not been used, and was not intended by him to be used, in such violations. He insisted that $20 " * * * would be a good-size [sic] wager for me. * * * "

■ The aforementioned wagering statutes apply without particular reference to the size or number of bets taken. United States v. Simon, C.A.7 (1957), 241 F.2d 308, 310[2]. The issue confronting the Court, therefore, is: what portion of the currency involved had Mr. Robinson used, or did he intend to use, in his gambling operations?

Mr. Robinson was unable to state under oath what part of the currency seized from him as aforesaid had been thus used or what part he intended thus to use. In response to inquiries from the Court as to whether any of the monies taken from him by the agents were the proceeds of "up bets"[3] or represented funds he intended to use in paying any bets he might have lost or lose, Mr. Robinson responded: " * * * It could have been, but I couldn't say specifically that it was * * *. * * * Well, honestly, I couldn't say * * * if one of them [sic] ten-dollar bills was a bet or wasn't; I don't know * * * " It appears that the following query and response summarize his contentions:

"THE COURT: You are not in position to say that [any of the money seized] was or was not [gambling money]. Is that your answer?

"A. Yes, sir. * * * "

■ The Court notices judicially that currency of the United States of America is ordinarily used for a legal purpose. " * * * Statutes authorizing the forfeiture of property ordinarily used for a legal purpose are drastic in their operation and are strictly construed. * * * " United States v. One 1960 Ford 4-Door Galaxie Sedan, D.C.Tenn. (1962), 202 F.Supp. 841, 843 [1, 2], citing United States v. Ryan (1931), 284 U.S. 167, 176, 52 S.Ct. 65, 76 L.Ed. 224. " * * * '[F]orfeitures are not favored; they should be enforced only when they are within both letter and spirit of the law.' * * * " United States v. One 1936 Ford V-8 DeLuxe Coach (1939), 307 U.S. 219, 226, 59 S.Ct. 861, 865, 83 L.Ed. 1249, 1255 (headnote 4). " * * * [S]tatutes to prevent fraud on the revenue are construed less narrowly, even though a forfeiture results, than penal statutes and others involving forfeitures * * *." United States v. Ryan, supra, 284 U.S. at 172, 52 S.Ct. at 67, 76 L.Ed. at 227.

■■ Forfeiture is proper herein if Mr. Robinson had used the currency involved for proscribed gambling purposes, or if Mr. Robinson intended to so use such currency. It is seldom that intent may be proved by any means other than circumstantial evidence, but what Mr. Robinson did or did not do may indicate his intent or lack of intent, as the case may be. It is reasonable to infer that Mr. Robinson intended the natural and probable consequences of every act which he did and of every act which he failed to do. In determining Mr. Robinson's intent in the premises, the Court will consider any statements made, and not made, by Mr. Robinson, as well as all facts and circumstances in evidence herein which may aid the Court in determining his intent. Morisette v. United States (1952), 342 U.S. 246, 276, 72 S.Ct. 240,

2. Mr. Robinson indicated that these were friendly-type bets with his customers, United States v. Simon, C.A.7 (1957), 241 F.2d 308, but this contention is not supported by the totality of the facts and circumstances presented.

3. When a customer placed a bet with Mr. Robinson, and Mr. Robinson held the entire proceeds of the wager, this constituted an "up bet".

255, 96 L.Ed. 288, 307. Mr. Robinson having admitted that he accepted wagers without having registered and paid the tax as required by the applicable federal statutes, the Court will also consider evidence of earlier conduct on his part in support of any inference as to Mr. Robinson's intention in the instant situation. Nye & Nissen v. United States (1949), 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919, 924.

For a period of thirty-eight months, i. e., until November, 1963, Mr. Robinson, who is a professional gambler, possessed a federal wagering tax stamp. While so armed with this indication of his compliance with the applicable federal internal revenue laws, Mr. Robinson aggressively and consistently sought wagers, visiting various bars and automobile filling stations regularly for that purpose.

The claimant kept records of his wagering activities in coded form, using various letters, figures, nicknames, etc., to provide himself with information he might need *in futuro,* but which would be troublesome for state policing authorities to decipher. This wagering usually took the form of parlays.[4] At one time in his career, Mr. Robinson operated a newsstand. He earned profits of from $5,000 to $7,000 annually from his gambling pursuits.

Mr. Robinson surrendered his wagering stamp and ceased his monthly reports of wagering activities as aforesaid and then transferred his presence to Florida shortly after Christmas, 1963. He planned to become employed as a bartender in Florida, but for some undisclosed reason, he changed his employment plans and busied himself at three horse racetracks where he " * * * played the horses * * * " and visited the dog-racing tracks. In April, 1964, he " * * * acquired * * * " a $1,000 bill " * * * at probably Gulf Stream just before I left there—maybe within a week or ten days. * * * "

Returning to Tennessee thereafter, Mr. Robinson confined his activity in the ensuing six months period, according to his testimony, to negotiating for a site at which to open a news-stand. In the latter part of October, 1964, however, Mr. Robinson acquired the Victory Bar in Chattanooga, Tennessee. There, Mr. Robinson dispensed beer, light lunches, magazines and second-hand books. He dealt with " * * * fifty or a hundred customers a day. * * * " He estimated that he averaged cashing " * * * between 12 and 25 checks a week * * *, [p]ay checks, mostly. * * * "

Mr. Robinson described as the "nucleus" of his business the patronage of sheetmetal workers whose labor union hall was near his bar. Most of the checks he cashed ranged from slightly over $130 to $190. He attempted to be prepared to cash from two to five payroll checks after the banks had closed on Friday evenings.

According to the stipulated testimony of the teller with whom Mr. Robinson customarily transacted his banking business, he " * * * usually asked for some silver and small bills. * * * " This teller also cashed for Mr. Robinson an unspecified number of payroll checks from customers of the Victory Bar on Friday, October 8, 1965.

Prior to this date, and unknown to Mr. Robinson, special intelligence agents of the Internal Revenue Service, federal Treasury Department, had received information that Mr. Robinson was accepting wagers at the Victory Bar sans compliance with the applicable statutes relating to the wagering business. These agents conducted surveillances of activities within this Bar from September 16, 1965 through the following October 13. They accumulated from the surveillance sufficient information to provide the necessary affidavits to cause warrants to be issued for the search of the Victory Bar and Mr. Robinson's person. These warrants were executed by agents

---

4. Mr. Robinson's obviously knowledgable explanation of betting by parlays was " * * * Take three or four teams, and get so much if they all win; three teams [win], so much [less]; four teams [win], so much [more]. * * * "

James W. Ledbetter and E. L. Keene in the early afternoon of Friday, October 8, 1965.

In the surveillance process, Agent Willard M. Cummings overheard a conversation in which a patron of the Victory Bar offered to bet Mr. Robinson " * * * another hundred * * * " on the Army-Tennessee football game if Mr. Robinson would give him " * * * Tennessee and eight points * * * ", the "line" on that gridiron contest having been previously announced to this patron by Mr. Robinson as being " * * * Tennessee and 6½ * * * ."[5] Strangely, Mr. Robinson was receiving through the United States mail each Monday morning from an unknown benefactor a form "line-sheet"[6] which Mr. Robinson filled in himself from quotations of betting odds on sporting events appearing in the (then) two Chattanooga newspapers. Mr. Robinson utilized these line-sheets in accepting wagers over the telephone as well as negotiating for them in person within the Victory Bar.

As a result of the search of his person, the revenue agents seized coded notations of bets Mr. Robinson had made theretofore from his shirt pocket, a line-sheet on football games to be played that weekend from his right front trousers pocket, and from the left front pocket of Mr. Robinson's trousers, the following bills of United States currency:

| quantity | denomination | aggregate |
|---|---|---|
| 1 | $1,000 | $1,000 |
| 8 | 100 | 800 |
| 5 | 20 | 100 |
| 1 | 10 | 10 |
| 9 | 5 | 45 |
| 8 | 1 | 8 |
| 32 | | $1,963 |

Mr. Robinson testified that the $1,000 bill of currency confiscated by these revenue agents was the same bill he had " * * * acquired * * * " nearly eleven months prior thereto in Florida, that he had placed and kept it in his safety deposit box at his bank after his return to Chattanooga, that it had remained there until his visit to his bank on the late morning of the day of the aforementioned raid, and that he had retrieved it on that occasion to use over the weekend in the effort to promote the sale of chances on yet another $1,000 bill of currency being offered by Post No. 14 of the American Legion in an approaching lottery.

Although Mr. Robinson had not favored that post of war veterans with his active membership, he claims he was motivated to enlist others to join as members, to promote sale of its lottery chances by advertisements on the wall of his Bar, and by "flashing" his $1,000 currency bill to potential participants in the lottery, because the net proceeds of the raffle would be utilized for humanitarian purposes. He testified that many of the customers of his Bar had never seen an actual $1,000 bill of currency and claims that he sold 52 tickets before his establishment was raided by the officers.

If Mr. Robinson's testimony in these regards may be believed and is correctly understood by the Court, he exhibited unusual traits of salesmanship for the cause which attracted his active interest, because he had retrieved his bill from his lock box less than an hour before it was seized, a part of which time he had devoted to receiving tonsorial attention, and before he had gone on duty at his Bar. Mr. Robinson was motivated secondarily, however, by the thought that the oddity of an actual $1,000 bill of cur-

5. The "smart money" in this instance wasn't so "smart", Tennessee defeating Army decisively in the football game which ensued.

6. A "line-sheet" lists the sporting events to take place during the next weekend, with blank blocks to the right of each event, which blocks were to be filled in as to different "lines" of odds thereon from different sources of authority.

rency would surely draw business to his establishment on this busy Friday.[7]

■ Mr. Robinson insists that his aforesaid currency bill was so segregated from the other currency on his person as to avoid forfeiture. It is noted, however, that, by his own admission, Mr. Robinson had used, and intended to use, this bill to promote, as an uncompensated agent, wagering by the aforenamed veterans' organization. The libelant offered no evidence as to whether this organization had complied with the federal revenue statutes relating to wagering. However, it must be presumed that this veterans' group was in compliance with the law, The Bank of the United States v. Dandridge (1827), 25 U.S. [12 Wheat.] 64, 69, 6 L.Ed. 552, 554, and " * * * a presumption ordinarily prevails, in the absence of proof to the contrary * * *." Lamb v. Sutton, D.C.Tenn. (1958), 164 F.Supp. 928, 934 [8], affirmed C.A. 6th (1960), 274 F.2d 705. The $1,000 bill of currency must have been shown to have been guilty in some way before it may be forfeited. Goldsmith-Jr. Grant Co. v. United States (1921), 254 U.S. 505, 510–511, 41 S.Ct. 189, 65 L.Ed. 376, 379 (headnote 2). The Court finds and concludes, accordingly, that the $1,000 currency bill seized by the officers is not subject to forfeiture.

As to the remaining $963 in currency bills seized from the person of Mr. Robinson, the answer is less obvious. He required ready cash to accommodate his legitimate customers' requests to cash their respective payroll checks. A sufficient amount of ready cash to meet the demands of his auxiliary trade also appears to have been a closely related facility of the wagering department of his enterprise. See United States v. Ryan, supra, 284 U.S. at 176, 52 S.Ct. 65, 76 L.Ed. 224.

Mr. Robinson testified he had been to the bank shortly before the raid. " * * *

So, I had," he testified, " * * * I believe, seven or eight one-hundred dollar bills, and then the smaller money * * * " as a result of his banking transactions. Further than this, Mr. Robinson could only generalize. He said:

" * * * [W]hen I opened up my place of business, I usually put * * * about a hundred dollars' worth of small money in my register with my silver. Behind the register I always have * * probably $50 or $60 worth of silver * * * in a little bag. * * * [O]n Fridays * * * I cashed four or five checks, and sometimes six or seven, but usually four or five on Friday evening[s]. * * * "

No evidence of the number and respective amounts of any checks Mr. Robinson may have cashed before the raid was offered, so the Court must decide this remaining issue on the bases of facts established by the evidence and reasonable inferences therefrom.

■ The Court is of the opinion and finds that the coded notations of Mr. Robinson's outstanding bets at the time of the raid indicated that $291.50 represented "up" with him on football games scheduled to be played that weekend, and that he had made bets in the aggregate amount of $755 on the baseball world series in progress at the time of the raid. The Court notices judicially that Friday is usually an off-day in series play, so it is inferable further that those bets were either unsettled wagers on the game played the preceding day between the Los Angeles Dodgers and the Minnesota Twins or wagers accepted by Mr. Robinson for games to be played the following day (Saturday). If the Court's inferential computations approximate accuracy, Mr. Robinson had committed or was holding $828.18 at the time of the raid, as well as an additional amount of $134.82 for commitment on that day.

---

7. It is inferable that Mr. Robinson anticipated this particular Friday hopefully, because, not only was it pay-day for many of his customers, in addition the football season was moving into great activity, while the 1965 baseball World Series was being played.

The testimony of Mr. Robinson is subject to careful scrutiny as to its credibility. The assumption that he spoke the whole truth from the witness stand under oath was dispelled by the character of some of the testimony which he gave, including its unreasonableness, and by the manner in which he will be affected by the verdict herein. There are material inconsistencies in his testimony. Cf. Aetna Life Insurance Co. v. Ward (1891), 140 U.S. 76, 88, 11 S.Ct. 720, 721, 35 L.Ed. 371, 375; Quock Ting v. United States (1891), 140 U.S. 417, 420–421, 11 S.Ct. 733, 734, 35 L.Ed. 501, 502.

The Court infers that Mr. Robinson's primary area of interest was gambling, and that his legitimate enterprise served as a mere "front" for his gambling activities. The Court infers further that Mr. Robinson could be expected to use any money in his establishment to "bank" his gambling pursuits. His being unable to segregate any of the funds seized from him, except the $1,000 currency bill, the Court finds and concludes that the entire balance of $963 seized from his person was guilty of statutory violations. Cf. Goldsmith-Jr. Grant Co. v. United States, supra, 254 U.S. at 510–511, 41 S.Ct. 189, 65 L.Ed. 376.

A careful consideration of all the evidence and the surrounding facts and circumstances leads this Court to the finding and conclusion that the libelant has established by a preponderance of the evidence the necessary relationship between the $963 in currency bills discovered in Mr. Robinson's pocket and his admitted violation of the federal internal revenue laws relating to wagering. Therefore, the clerk will prepare, enter and sign a judgment that the sum of $1,963.00, less $1,000.00, or $963.00, is forfeited to the United States of America, and that the sum of $1,000.00 is property of the claimant Matthew J. Robinson and is ordered to be returned to the claimant. All costs of this proceeding will be taxed to Mr. Robinson. 26 U.S.C. 7325(3).