588 F.2d 521
 79-1 USTC P 16,310
 Marion D. GRIFFIN, and Madelyn Youngblood Simpkins,
Executrix of the Estate of John H. Simpkins,
Deceased, Plaintiffs-Appellees-Cross Appellants,
v.
UNITED STATES of America, Defendant-Appellant-Cross Appellee.
 No. 76-3633.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 26, 1979.
 
 R. Jackson B. Smith, U. S. Atty., Edmund A. Booth, Jr., Asst. U. S. Atty., Augusta, Ga., Myron C. Baum, Acting Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Appellate Section, Gary R. Allen, John G. Manning, Atty., Dept. of Justice, Tax. Div., Washington, D. C., for the U. S.
 William J. Cooney, William C. Calhoun, Augusta, Ga., for plaintiffs-appellees.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before WISDOM, GODBOLD and TJOFLAT, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 Taxpayers Griffin and Simpkins participated in a "numbers" gambling operation centered in Augusta, Georgia. During federal law enforcement raids that ended the operation, the FBI seized.$10,918.32 in cash from Griffin's home and $24,719.00 in cash from Simpkins' home. Law enforcement officers had used properly authorized wiretaps in obtaining information about the gambling ring. After the raids information about the gambling operation, including information about the money seized, was furnished by the Department of Justice to the Internal Revenue Service. On the basis of this information IRS determined that Griffin and Simpkins were liable for unpaid wagering excise taxes. Jeopardy assessments of $12,452.11 (Griffin) and $27,749.01 (Simpkins) were levied and the seized money applied in partial payment.
 
 
 2
 Simpkins and Griffin pleaded guilty to criminal charges arising from their participation in the gambling ring. When the pleas were taken testimony was given in open court disclosing the contents of the intercepted telephone conversations.
 
 
 3
 After conclusion of the criminal cases IRS was given the physical evidence that had been seized by the FBI, including transcripts of the wiretapped telephone communications. Upon receiving this evidence IRS calculated that Griffin's unpaid wagering taxes, with interest, were $208,570.17 and that Simpkins' unpaid taxes, with interest, totaled $73,656.75.
 
 
 4
 Griffin and Simpkins, after filing claims with IRS for refund of the cash seized from them, filed this suit seeking refund of the money. The United States counterclaimed for the portion of the assessments remaining unpaid.[1]
 
 
 5
 At trial the government attempted to establish the basis for its assessments through agent testimony and physical evidence, including transcripts of wiretapped conversations. The jury found that Griffin was not a principal in the gambling ring and was therefore not liable for any wagering taxes. The district court accordingly ordered that he recover the cash seized from him, with interest, and dismissed the government's cross-claim against him. The jury found Simpkins liable for unpaid wagering taxes, but only $14,675.30, rather than the $73,656.75 claimed by the government. The trial judge ordered refund of the money seized in excess of Simpkins' liability, and dismissed the government's counterclaim against Simpkins.
 
 
 6
 All parties have appealed.[2] Taxpayers contend that the trial judge erred in admitting the transcripts of wiretapped conversations and evidence derived therefrom. The government asserts that the trial court erred in submitting to the jury whether Griffin was liable for unpaid wagering taxes, contending that he was liable as a matter of law and that the only jury issue was the extent of his liability. The government argues that the jury's assessment of Simpkins' tax liability must be set aside because Simpkins allegedly introduced no evidence other than his own uncorroborated testimony supporting an estimate of tax liability lower than the government's, thus failing in his burden of rebutting the government's estimate of liability. Finally, the government argues that the jury finding of Simpkins' tax liability should be set aside because of alleged inconsistencies in the jury's special verdicts.
 
 I. Disclosure of wiretap evidence
 
 7
 Taxpayers concede that the FBI was properly authorized, pursuant to the federal wiretap statute, 18 U.S.C. § 2516, to intercept telephone communications of the numbers operation in order to ascertain whether violations of federal gambling criminal statutes had occurred. They contend, however, that 18 U.S.C. § 2515 bars the admission into evidence, at a civil or criminal trial, of any intercepted wire communication, or evidence derived therefrom, that has been improperly disclosed to one department of the government by another. They argue that interdepartmental disclosures within the federal government are barred by the wiretap statute unless specifically authorized by the wiretap statute. They contend that the FBI's disclosure of the wiretap evidence to IRS for use in civil tax proceedings is not specifically authorized by any provision of the statute, therefore, all wiretap evidence and evidence derived from it should have been excluded, and without this evidence there could have been no judgment in the government's favor.
 
 
 8
 After the initial briefs were filed in this case, this court decided Fleming v. U. S., 547 F.2d 872 (CA5), Cert. denied, 434 U.S. 831, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977). In that civil wagering tax assessment suit, the government used information derived from the same wiretaps as those in the present case against another member of the numbers operation. The same argument as in this case that interdepartmental transfers are barred by the wiretap statute was presented to this court in Fleming and was rejected on the basis of the facts of Fleming. The court reached the conclusion that § 2515 did not bar admission at trial of wiretap evidence improperly disclosed from one federal agency to another, so long as the initial wiretap was lawfully authorized. Moreover, the court suggested that FBI disclosure of wiretap information gathered in the course of a criminal investigation of a gambling ring to IRS for purposes of assessing civil wagering tax liability is specifically authorized by either § 2517(2)[3] or § 2517(3)[4], or both. The Court, however, did not hold that its reading of the wiretap statute to allow free inter-agency disclosures of wiretap information was applicable to all conceivable cases. Instead it limited its construction of the statute to the specific facts before it, concluding that no statutory purpose would be served by a more restrictive interpretation of the government's authority to allow inter-agency disclosures of wiretap information where (1) there is no showing that the original criminal investigation was a "subterfuge for developing information for civil tax proceedings," and (2) there is no infringement on any privacy interest caused by disclosure of the conversations from one agency to another. We held that there had been no "subterfuge" because the wiretaps had resulted in criminal convictions and that the privacy interest infringed by the disclosure was "weak" because the intercepted communications were "already part of the public record of a criminal prosecution." The Fleming court concluded that it would not make greater efforts to resolve any possible ambiguities in the statute until a stronger showing of infringement upon privacy interests or a showing of subterfuge was made in a subsequent case.
 
 
 9
 On first impression Fleming is controlling. Taxpayers attempt to deal with it in three ways. First, they suggest that it is simply wrong and should be overruled. One Fifth Circuit panel does not overrule another. Robinson v. Parsons, 560 F.2d 720 (CA5, 1977).
 
 
 10
 Second, they contend that their privacy interests were significantly infringed since the first jeopardy assessment, based on information derived from the FBI wiretaps, was made before the wiretap information had been placed in the public record of any criminal proceedings. Their argument apparently is that they retained a privacy interest in the intercepted conversations at the time these conversations (or information derived from them) was disclosed to IRS. Thus, they say, Fleming is not controlling because of the lesser privacy interest implicated in that case and this panel is free to independently construe the wiretap statute and to reassess the arguments that the statute bars introduction of these wiretaps at trial.
 
 
 11
 Whatever the merits of this argument based on the sequence in which disclosures, jeopardy assessments, criminal trials, and civil trials occurred, we need not consider it here because the sequence of events relevant to the taxpayers' privacy interests conforms exactly to the sequence of events in Fleming, as taxpayers' counsel conceded in brief and oral argument. In both cases the sequence of events was (1) lawful interception of telephone communications by the FBI; (2) FBI briefing of IRS civil agents on the contents of wiretapped communications; (3) initial IRS calculation of unpaid wagering tax liability based on information given by the FBI, with subsequent jeopardy assessments; (4) placing of contents of wiretaps on public record in criminal proceedings; (5) FBI transmittal to IRS of additional evidence derived from the wiretapped communications; (6) second IRS calculation of unpaid wagering tax liability based on the additional evidence; and (7) filing of refund suit by plaintiffs, with a subsequent IRS counterclaim for the remainder of the unpaid tax. The privacy interests implicated in Fleming and those in the present case do not differ in any significant respect.[5] The wiretap statute must be construed here as it was in Fleming.[6]
 
 
 12
 Taxpayers' third argument is that one of the factual premises of Fleming, not relevant to the strength of the privacy interests implicated, is not present in the instant case. In Fleming the court stated that the parties had stipulated that a district judge had authorized or approved the use of wiretap materials in the tax refund suit pursuant to 18 U.S.C. § 2517(5). 547 F.2d at 875 n. 3. No like stipulation appears in the present case. Taxpayers argue that there has been no § 2517(5) district court authorization for the use of the wiretaps in civil proceedings. For reasons discussed below we do not inquire into the meaning of the stipulation made in Fleming and whether it binds the taxpayers in this case.
 
 
 13
 Fleming relied on three separate provisions of the wiretap statute in approving the disclosures: 18 U.S.C. §§ 2515, 2517(2) and 2517(3). Section 2517(3) allows disclosure of legally obtained wiretap information in "any proceeding held under the authority of the United States." The Fleming court noted that this statute apparently would allow FBI agents to testify at a civil trial about the contents of wiretap information and concluded that § 2517(3) should be read to authorize disclosure to IRS of the contents of the testimony before trial as well.[7]
 
 
 14
 Taxpayers argue here, as was argued in Fleming, that disclosure at a civil tax trial (or any trial or proceeding involving crimes, offenses, or other matters different from those specific offenses that the original wiretap was authorized to gather information about) can be made only if a district judge has previously approved this disclosure. Taxpayers assert that § 2517(5) requires such district court approval prior to use at trial and that no such prior approval had been given here. The Fleming court accepted the argument that such approval is required but concluded that it had been given. We pretermit the dispute over whether there is a § 2517(5) disclosure order that affects this case, but, nevertheless, approve the disclosure and use of the wiretap evidence on the basis of Fleming. The Fleming court relied not only on § 2517(3) but also on § 2517(2) and § 2515 in approving the disclosures there. According to Fleming, in cases where the privacy interests are no stronger than they are here § 2515 does not bar the admission into evidence of lawfully obtained wiretaps and § 2517(2) affirmatively authorizes such use. Section 2517(2) is expressly exempted from the requirements of § 2517(5); § 2515 also does not appear to be constrained by § 2517(5) requirements. Thus the Fleming holding on each of these grounds is unaffected by any lack of a disclosure order here, and we affirm the admission of the wiretap evidence on that basis.
 
 
 15
 II. Submission to the jury of Griffin's wagering tax liability
 
 
 16
 We now turn to the government's contentions of error. With respect to Griffin, who was found by the jury not to be liable for any tax, the government contends that he was liable as a matter of law and the only jury issue was the extent of his liability. The crucial issue is whether Griffin was "engaged in receiving wagers for or on behalf of" the owners of the numbers ring, within the meaning of 26 U.S.C. § 4411.
 
 
 17
 The numbers operation was structured in this way: Each day a winning "number" was generated through use of the total sales of stocks and bonds sold on the New York Stock Exchange that day. Local bettors would contact one of the "writers" involved in the operation and tell him the number he had selected and the amount of his wager. The writers phoned in to the central "bank" the numbers selected and the amount wagered on each number. The money deposited with the writers was picked up by "pick up" men, less a 15% Commission retained by the writers, and transported by them to the bank.[8] The "pick up" men received as compensation 25% Of the gross amount that had been bet with the writers who were handled by the pick up men.[9] If a bettor won the bank would send his winnings through the pick up men back to the writer, who would then pay off the customer.[10] Although the writers called in the wagers directly to the bank, they were chosen for participation in the scheme by the pick up men, who exercised some supervision over them. Viewing the facts in the light most favorable to Griffin, the jury could reasonably have concluded that Griffin was a pick up man in the operation.[11] The issue presented is whether this type of participation renders Griffin liable for the wagering tax as a matter of law.
 
 
 18
 26 U.S.C. § 4401(c) makes every "person who is engaged in the business of accepting wagers" liable for federal wagering tax.[12] Although the record is not completely unambiguous, we understand from it and the government's briefs that the government is not urging that Griffin is liable under this provision of § 4401(c).[13] Instead the government bases Griffin's liability on the last clause of § 4401(c), which must be read in conjunction with two other statutory provisions. The last sentence of § 4401 makes any person who fails to register as required by 26 U.S.C. §§ 4411 & 4412 liable for the wagering tax on wagers accepted. 26 U.S.C. § 4411 requires each person "who is engaged in receiving wagers for or on behalf of any person" who is liable for the wagering tax under § 4401(c) to pay a special $50 yearly tax. 26 U.S.C. § 4412 requires a person who is required to pay the special § 4411 tax to register with IRS and in his registration reveal the name of the person he "is engaged in receiving wagers for or on behalf of." Griffin did not register with IRS, and the government contends that this failure makes him liable for the tax on all of the wagers accepted by the writers hired by him.[14] The issue is whether his role as intermediary in the numbers operation included "receiving wagers for or on behalf of any person" liable for the wagering tax, in this case the owners of the central bank.
 
 
 19
 If Griffin had done nothing more than pick up money from the writers and turn it over to the bank, he would not be liable for the tax. The Supreme Court has construed the phrase "receiving wagers" as not including middlemen in a gambling scheme who merely convey wagers from writers to the central bank, U. S. v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957), and Treasury regulations conform to this view. See 26 C.F.R. § 44.4411-1(b) (1977).[15]
 
 
 20
 The government insists that Griffin was not solely a pick up man. Rather, the government says, when Griffin selected the writers who actually accepted wagers and who thus clearly were "engaged in receiving wagers for or on behalf of any (liable) person" he created an agent-principal relationship, thereby rendering the wagers just as much received by him as they would have been had the bettors placed the wagers directly with him.
 
 
 21
 The district judge to some extent accepted this incorporation of agency principles into the wagering tax statute, instructing the jury that "(a)ny wagers received by an agent or an employee on (Griffin's) behalf shall be considered to have been accepted by and placed with (Griffin)," but he added the significant qualification that Griffin would be liable for wagers received by his agents only "so long as he has a proprietary interest in the wagering activity." The government objected, contending that this qualification was error because a principal is deemed to bear legal responsibility for the acts of his agents regardless of whether he has a proprietary interest in their acts. We need not reach this contention nor decide whether agency law should be used in construing the federal wagering tax statute,[16] because the government failed to produce evidence showing that the writers hired by Griffin were his agents.
 
 
 22
 The government's burden in wagering tax suits is not heavy, but neither is it nonexistent. A presumption of correctness attends IRS wagering tax assessments, but it is premised on the government's production of evidence that would support an inference that the taxpayer was in fact engaged in gambling activity that made him liable for the tax. See Carson v. U. S.,560 F.2d 693, 697 (CA5, 1977); Gerardo v. Commissioner, 552 F.2d 549, 554 (CA3, 1977); Pizzarello v. U. S., 408 F.2d 579, 583 (CA2, 1969). Ignoring for the moment Griffin's testimony that he physically accepted a few wagers, the government, in establishing Griffin's wagering tax liability, relied on evidence that allegedly supported an inference that the writers Griffin collected from were his agents. Thus the initial question presented to us is whether the evidence put forward by the government was sufficient to support an inference that an agency relationship existed.
 
 
 23
 The government relies upon Griffin's power to select writers and his "payment" of the writers[17] as tending to prove that the writers were his agents.[18] The argument is contrary to agency law. If an agency relationship did exist between Griffin and his writers, he would have had the power to hire and fire and the power of supervision, but his exercise of these two powers is not sufficient to show that a principal-agency relationship existed. See, e. g., Radich v. U. S., 160 F.2d 616, 618 (CA9, 1947) (power of termination does not establish agency); Mathews Conveyor Co. v. Palmer Bee Co., 135 F.2d 73, 81 (CA6, 1943) (power of one to control conduct of another does not establish agency); First Jackson Securities Corp. v. B. F. Goodrich Co., 253 Miss. 519, 176 So.2d 272, 278 (1965) ("employee" not synonymous with "agent"). The most characteristic feature of an agency relationship is missing. The writers employed by Griffin were given no power to bring about business relationships between third parties and Griffin. They were employed by Griffin to bring about contractual relationships between bettors and the bank. Griffin was not liable on the bets placed with his writers; he was not responsible for paying off winning bettors. Since an essential characteristic of an agency is the power of the agent to commit his principal to business relationships with third parties, See, e. g., Esmond Mills v. Commissioner,132 F.2d 753, 755 (CA1, 1943); Easterling v. Volkswagen of America, Inc.,308 F.Supp. 966, 981-82 (S.D.Miss., 1969); Economic Research Analysts, Inc. v. Brennan, 232 So.2d 219, 221 (Fla.App., 1970); First Jackson Securities, supra ; Restatement (Second) of Agency, § 1(2) & 1(3), Comments d & e (1957), Griffin was not the principal of the writers when they were writing numbers on which the bank was obligated to pay. The most plausible way to view the arrangements of the gambling operation is that the writers accepted wagers not as agents of Griffin but as agents of the bank, which bore responsibility for paying the winners. Thus, still leaving aside the few bets that Griffin physically accepted, we conclude that Griffin was not "engaged in receiving wagers" within the meaning of § 4411 and that it was not necessary to submit to a jury the issue of whether the writers were his agents. U. S. v. Marquez, 332 F.2d 162, 163-64 (CA2, 1964) (Marshall, J.), is apparently to the contrary, but we do not accept its reading of Calamaro to mean that only gambling operation members who are exclusively pick up men are exempt from the wagering tax. The policy argument that imposing liability on Griffin would further the statutory purpose of ascertaining the identity of the ringleaders of gambling rings, is misplaced because, as the Calamaro court said,
 
 
 24
 The fact remains, however, that Congress did not choose to subject all employees of gambling enterprises to the tax and reporting requirements, but was content to impose them on persons actually "engaged in receiving wagers." Neither we nor the Commissioner may rewrite the statute simply because we may feel that the scheme it creates could be improved upon.
 
 
 25
 354 U.S. at 357, 77 S.Ct. at 1142, 1 L.Ed.2d at 1399.
 
 
 26
 Finally we turn to the "very few" bets that Griffin admitted physically accepting. Had proper proof been introduced, Griffin could have been found liable for tax arising out of these "direct" bets. But the government submitted the case to the jury on the two theories, Griffin's liability arising from the numerous bets placed with the alleged agents and the few bets placed directly with Griffin. It introduced no estimate or evidence of the dollar amount of the direct bets. The government having failed on its burden of coming forward with evidence on the agency theory, no presumption of correctness of the gross assessment arose with respect to the few direct bets included therein. There was no burden on the part of Griffin to refute presumptive correctness; indeed, it was, and is, obvious that the gross assessment, which was based upon both indirect and direct bets, could not be correct with respect to only direct bets.
 
 III. The amount of Simpkins' tax liability
 
 27
 Simpkins was both writer and pick up man. He does not argue that he was not liable for the wagering tax that the jury found he owed. Rather the government contends that he is liable for more. The government seized $24,719.00 from Simpkins' home. He filed this refund suit seeking to recover a portion of this money, alleging that he had handled only about $100 of bets a day during the relevant period. The 10% Tax due on this volume of bets would be more than satisfied by the $24,719.00 seized from Simpkins, and he asked for refund of the excess. The government counterclaimed, seeking payment of $76,686.76 in unpaid wagering taxes. IRS' calculation of wagering taxes owed by Simpkins was based on its estimate that he had handled $475.05 a day in wagers during the relevant period. The jury was given special interrogatories on this issue, and they found that Simpkins had handled $101.00 a day during the relevant period. Acting on this special verdict, the district judge ordered refund of part of the money seized from Simpkins and dismissed the government's counterclaim. The government argues that the judge erred in submitting this issue to the jury because Simpkins had not introduced sufficient evidence to meet his burden of disproving IRS' estimate of his tax liability. We disagree.
 
 
 28
 If, as here, a taxpayer fails to keep a daily record of all wagers placed with him as required by law, the Commissioner of Internal Revenue may estimate the amount of tax liability. See U. S. v. Firtel, 446 F.2d 1005 (CA5, 1971). In a refund suit by the taxpayer, he bears a double burden of proof. To recover he must first prove that the Commissioner's estimate is inaccurate and then prove the correct amount of tax owed. U. S. v. Janis, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046, 1052 (1976). For purposes of this opinion we assume that the rule in this circuit is that the taxpayer bears the same burden of proof with respect to a government counterclaim for additional taxes due. See Heyman v. U. S., 497 F.2d 121 (CA5, 1974).[19] Finally, the law of this circuit is that a taxpayer cannot meet either his burden of proving the Commissioner's assessment inaccurate, Heyman v. U. S., supra, or his burden of proving the correct amount owed, Heyman; Carson v. U. S., 560 F.2d 693, 699 (CA5, 1977), solely by his own uncorroborated oral testimony about the amount of wagers handled.
 
 
 29
 Simpkins testified by deposition that he took in "about $100" in wagers a day, rather than the $475 claimed by the government. If this were the sole evidence introduced it would be insufficient to meet his burden of proof, but additional pieces of evidence tend to corroborate Simpkins' testimony. He testified that he kept his day's take from the numbers operation separate from his other money and that on the day his house was raided he had wrapped the previous day's take in a one pound paper bag, which he had placed in a drawer. He also testified that he did not know precisely how much money was in the bag the day of the seizure. This bag was seized from the drawer by FBI agents and found to contain $101 in cash. The bulk of the money seized, some $27,000, was found in a small steel chest that Simpkins had concealed behind his bed.[20]
 
 
 30
 That $101 was found wrapped separately, taken in conjunction with the rest of the money being found in places not readily accessible, was sufficient corroboration of Simpkins' oral testimony that he took in about $100 a day for the judge to allow the issue to go to the jury.[21] Simpkins did not rely only on his uncorroborated testimony; thus Carson and Heyman do not control. From the evidence introduced the jury could reasonably conclude that Simpkins had carried his burden of proving that the government's estimate of the amount of wagers he handled was incorrect and his burden of proving that he had instead handled about $100 a day.
 
 IV. Inconsistency of jury special verdicts
 
 31
 The jury was asked this special interrogatory: "Has the plaintiff proved the correct specific dollar amount of wagers, . . . which were accepted by John Henry Simpkins during any of the periods involved?", and it answered " No." It was also given this interrogatory, "What was the total amount of gross wagers, . . . on a daily basis, which were accepted by Mr. Simpkins . . .?" The jury answer was $101 per day. The government argues that the two answers are inconsistent, that since the answer to the first question was "No," the jury must have concluded that Simpkins had failed to meet his burden of proving the correct amount of taxes he actually owed and hence should have answered the other interrogatory with the government's figure of $475 per day.
 
 
 32
 We do not agree that the answers are inconsistent. The first interrogatory asked whether "the Plaintiff proved" the correct amount of wagers received. The jury could have construed this phrase to mean that the evidence presented By Simpkins had to be sufficient to prove the correct amount of wagers he had handled. The jury could reasonably have concluded that the evidence presented by Simpkins his testimony was not enough standing alone. Thus the negative answer. But the jury also could consistently have concluded that the government's evidence, particularly the testimony of the FBI agent, taken in conjunction with Simpkins' testimony, was sufficient to prove the correct amount of wagers handled by Simpkins. Of course, Simpkins was not restricted to his own evidence in carrying his burden of proof.[22]
 
 
 33
 The judgments of the district court are AFFIRMED in all respects.
 
 
 
 [1]
 Before trial Simpkins died and his widow, Madelyn Youngblood Simpkins, the executrix of his estate, was substituted as plaintiff
 
 
 [2]
 Griffin joins in asserting as error the admission of wiretap evidence, solely to protect his interest in the event the government prevails on its challenge to the jury verdict in his favor
 
 
 [3]
 Which authorizes use by law enforcement officials of wiretap information "to the extent such use is appropriate to the proper performance of his duties"
 
 
 [4]
 Which authorizes persons lawfully in possession of wiretap communications to disclose, under oath, the contents in "any proceeding held under the authority of the United States."
 
 
 [5]
 No governmental "subterfuge" in obtaining the initial authorization for the wiretaps has been shown or suggested by taxpayers
 
 
 [6]
 Taxpayers also argue that there is a factual error in Fleming that we ought not repeat. They suggest that the Fleming court mistakenly thought that any transfer of information from the FBI to IRS came only after the wiretap material was placed on the public record in the criminal proceedings. The court made no such error. The opinion clearly evidences an awareness that the FBI forwarded information "before and after the guilty pleas and attendant testimony." See 547 F.2d at 873
 
 
 [7]
 With the always-present qualification that this construction of the statute is made only in circumstances where no "subterfuge" or significant infringement of privacy interests has been shown
 
 
 [8]
 Via yet another intermediary, the "controller."
 
 
 [9]
 Since the writers had already retained 15% Of the gross, the pick up men netted only 10% Of the gross amount bet with their writers
 
 
 [10]
 The writers also were allowed to retain 10% Of what the bettors won
 
 
 [11]
 Griffin testified that he also acted as writer for a "very few" wagers. We deal with this aspect of the case below
 
 
 [12]
 Ten percent during the time the numbers ring was in operation, since reduced to 2%. See I.R.C. § 4401(a), As amended by Act of Oct. 29, 1974. Pub.L. No. 93-499, § 3(a), 88 Stat. 1549
 
 
 [13]
 Treasury regulations provide that in order for a person to be "in the business of accepting wagers" he must "(make) it a practice to accept wagers with respect to which he assumes the risk of profit or loss depending upon the outcome of the event or contest with respect to which the wager is accepted." 26 C.F.R. § 44.4401-2(b). Except for the "very few" bets that Griffin personally wrote, See notes 10 & 11 Supra, the jury could reasonably have found that he did not stand to win or lose depending on the number selected for the day. Thus his duties as a pick up man could not make him liable under this section. Cf. Evans v. U. S., 349 F.2d 653, 658 (CA5, 1965) (three classes of persons covered by federal gambling statutes are "bankers," "writers" and persons having a "proprietary interest"). But see Gennaro v. U. S., 369 F.2d 106, 108-10 (CA8, 1966), Vacated on other grounds, 390 U.S. 200, 88 S.Ct. 900, 19 L.Ed.2d 1036 (1967) (seemingly holding that a proprietary interest is not required in order for a person to be "in the business of accepting wagers") (Semble ). The district judge did not submit to the jury whether Griffin was liable under this clause for the bets he actually wrote, and the government did not except to this failure
 
 
 [14]
 The government also contends that he was liable for the tax on the few wagers that he personally wrote, because of his failure to register. This aspect of the case is discussed separately below
 
 
 [15]
 Example 2 under this subsection of the Treasury regulations describes the functions of a pick up man who is not subject to a wagering tax
 "Example (2). B operates a numbers game and has an arrangement with ten persons, who are employed in various capacities, such as bootblacks, elevator operators, news dealers, etc., to receive wagers from the public on his behalf. B also employs C to collect from the ten persons referred to, the wagers received by them on B's behalf and to deliver such wagers to B. C performs no other services for B. B and the ten persons who receive wagers on his behalf are liable for the special tax. C is not liable for the special tax since he is not engaged in receiving wagers for B."
 
 
 [16]
 One sentence in Calamaro suggests that application of agency principles might be appropriate. In explaining why a pick up man does not "receive" a wager, the Court stated, "Before the pick-up man enters the picture, in such a case as we have here, the wager has been received physically by the writer And in legal contemplation, by the writer's principal as well. 354 U.S. at 354, 77 S.Ct. at 1141, 1 L.Ed.2d 1397 (emphasis added)
 
 
 [17]
 We do not agree that Griffin "paid" the writers. It appears from the record that the writers were compensated by retaining a portion of the gross amount that they took in and by taking a percentage of their customer's winnings
 
 
 [18]
 There is also a suggestion in the record that Griffin exercised some power of supervision over the writers
 
 
 [19]
 Two recent panel decisions, Suarez v. U. S., 582 F.2d 1007, 1010 (CA5, 1978), and Carson v. U. S., 560 F.2d 693, 696 (CA5, 1977), state the contrary rule that with respect to a government counterclaim the taxpayer bears only the burden of proving the government's assessment incorrect and does not bear the additional burden of proving the correct amount of taxes owed. We need not conclusively resolve this apparent conflict here since the taxpayer met both burdens of proof. Other circuits differ on the issue. Compare De Lorenzo v. U. S., 555 F.2d 27 (CA2, 1977), With Higginbotham v. U. S., 556 F.2d 1173 (CA4, 1977)
 
 
 [20]
 An additional $840 was found in an envelope in a chest of drawers. The envelope bore the name and address of a friend for whom, Simpkins said, he was keeping the money. Also, $351 was taken from Simpkins' person. He testified that he was going to pay bills with this money
 
 
 [21]
 In Carson the taxpayer testified that all betting slips marked "00" were bets placed with other persons and introduced as corroborating evidence the slips themselves. The court held this insufficient corroboration because there was nothing in the "cryptic" "00" that suggested the taxpayer was telling the truth. 560 F.2d at 699. Here it is reasonable to infer that a day's take would be kept separate from other money and in a readily accessible place until delivery to the bank. The FBI agent who conducted the raid testified that the money in the paper bag contained "either the day's handle, or the day's take, or a portion of it."
 
 
 [22]
 The interrogatories were drafted by the government and submitted to the district judge