**PROVIDENT NATIONAL BANK, Executor of the Estate of Abram L. Spector and Trustee under Paragraph 12 of the Will of Abram L. Spector**

v.

**UNITED STATES of America.**

Civ. A. No. 76–2990.

United States District Court, E. D. Pennsylvania.

Aug. 29, 1980.

Roslyn G. Pollack, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for plaintiff.

John J. McCarthy, Chief Civil Trial Section, Mikal H. Frey, Donald J. Gavin, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

HUYETT, District Judge.

### I.

The taxpayer, Provident National Bank, executor of the estate of Abram L. Spector, filed this action seeking a refund of Federal estate taxes. Plaintiff asserts in its claim for refund that certain shares bequeathed in favor of the decedent's widow (the wid-

ow's shares) were worth more than the $157 per share figure determined by the Internal Revenue Service and that the taxpayer thus was entitled to a greater marital deduction. The matter is on remand from the United States Court of Appeals for the Third Circuit. *Provident National Bank v. United States*, 581 F.2d 1081 (3d Cir. 1978). The action was retried non–jury.

Initially the Court of Appeals directed me to determine the value, if any, in excess of $157, of the widow's shares. 581 F.2d at 1089. The widow's shares were 2,196 shares of class A non–voting common stock of Dial Shoe Company, Inc. (Dial) held by the decedent at his death which were subject to a testamentary directive that the shares be converted to preferred shares to be held for the benefit of the decedent's widow. The remaining 4,719 shares of common stock of Dial (both voting and non–voting) are referred to herein as the "non–widow's shares".

The court recognized that, depending upon the facts developed, the market value of the widow's shares was not necessarily their par value of $214.75 per share and could be some other value. 581 F.2d at 1089. The court directed me to take into account all relevant factors in arriving at market value on the basis of a fuller factual record. *Id.* One specific factor to be taken into account was that, even if the decedent's widow would otherwise realize a value in excess of $157 per share, there would be some effect on the value caused by the "prospect of a challenge by some minority shareholders". 581 F.2d at 1088.

The court also identified a secondary issue to be determined on remand in the event that the taxpayer demonstrated a value for the widow's shares in excess of $157 per share. In that event the court directed me to determine the overall increase in the value of all the decedent's Dial shares that it expected would result from the prospective recapitalization. 581 F.2d at 1091–92, n.26.[1]

---

1. This expected increase in the decedent's total equity holdings was explained by reference to footnote 16 of the opinion, 581 F.2d at 1087,

wherein the court, after noting that the net worth value of the company as a whole should not decrease upon recapitalization, stated that:

In resolving these issues, I am mindful that "taxpayers have the burden in a refund suit of proving not only entitlement to a refund but also the amount of the entitlement." *Tunnell v. United States*, 512 F.2d 1192, 1194 (3d Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 190, 46 L.Ed.2d 124 (1975). Thus plaintiff must prove that the government's valuation is incorrect, and that the stock here in question has a different fair market value than that used by the government in order to prevail as to any portion of this action. *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Griffin v. United States*, 588 F.2d 521, 530 (5th Cir. 1979); *Fed–Mart Corp. v. United States*, 572 F.2d 235, 238 (9th Cir. 1978); *Tunnell v. United States, supra.*

## II.

Abram L. Spector died, testate, on May 11, 1966, survived by a wife and four children. His will created a marital trust funded in part with shares of the Dial Shoe Company, Inc., a close corporation of which he was the major shareholder.[2] Paragraph 4 of that will provided:

4. I give, devise and bequeath to my wife, Ruth Spector, and to the Provident Tradesmens Bank and Trust Company, as Trustee, to hold in Trust, nevertheless for distribution and for the various purposes as hereinafter set forth to be known as Trust #1:

(a) All Class A Common Stock of Dial Shoe Company, Inc., in my name (to be exchanged for Preferred Stock of Dial Shoe Company, Inc., as hereinafter provided).

Paragraph 7 of that will provided:

7. As soon as possible after my decease, I direct my Executor, hereinafter named, shall cause the recapitalization of Dial Shoe Company, Inc., which shall provide the Five Percent (5%) Preferred Stock be created and issued in exchange for the Class A Common Stock which has been bequeathed under Paragraph 4(a) hereof to the Trustees of Trust #1; said Preferred Stock shall have a par value equal to the book value of the Class A Common Stock exchanged therefor, on a consolidated basis, as of the end of the fiscal year immediately preceding my death, and shall have the following attributes:

(a) Dividends shall be payable quarterly, the first quarterly payment payable three (3) months after the date of issuance at the annual rate of Five Percent (5%).

---

Fewer shares [2,196] were to be exchanged than were preserved in the recapitalization [4,719 - the 6,915 total shares less 2,196 widow's shares] and, since the aggregate amount of increases to one block must balance the decrease to the aggregate value of the remaining shares, the per share increase in the [widow's 2,196 shares] would be greater that the *per share* decrease in the remaining common stock. For sake of illustration, were the [widow's share] worth $214.75 per share, the per share value of the remaining [4,719 shares of] Dial common stock would have been reduced to approximately $130 [assuming the pre–recapitalization value of the company was $1,085,655 as the Revenue Agent did].

The manner in which the court arrived at the $130 figure and the effect of increasing the adjusted gross estate may be explained as follows. The total value of Dial–$1,085,655–*less* the value of the widow's 2,196 shares–$471,591 · would result in a $614,064 value for Dial's non widow shares. Thus, the average *per share* value of the 4,719 non widow shares would be approximately $130 per share ($614,-064/4,719). Thus, the new value of the decedent's 3,135 non–widow's shares would be $407,550 ($130 times 3,135). The decedent's total Dial holdings would be worth $879,141 ($471,591 for the widow's shares plus $407,550 for the non–widow's shares). This $879,141 for the decedent's total Dial holdings would exceed the $836,967 figure for those holdings at the administrative level by $42,174. Thus, there would be a $42,174 increase in the decedent's gross estate.

2. Dial was a Pennsylvania corporation engaged in the retailing of medium- priced women's and children's shoes. The company controlled 16 subsidiaries, two of which in turn controlled other subsidiaries and operated 55 leased stores in shopping centers and business districts in Pennsylvania, New Jersey and Maryland under the names of Dial Shoe, Wyman and Dalsimer Shoe.

(b) In the event the dividends shall be in arrears for two (2) quarterly payments and shall continue thereafter for a period of thirty (30) days, the voting power of Dial Shoe Company, Inc., shall vest in the holders of the Preferred Stock, and the directors and officers of the corporation shall immediately resign and be replaced by directors and officers elected by holders of the majority of the Preferred Stock. (c) The Preferred Stock shall be callable on liquidation or merger, on any dividend date, in whole or in part, on thirty (30) days notice at One hundred five Percent (105%) of par.

Paragraph 10 of that will provided:

10. In the event Dial Shoe Company, Inc., and its subsidiaries shall sustain losses commencing with the fiscal year beginning subsequent to my death, in the net aggregate amount of Two hundred thousand Dollars ($200,000), I direct my fiduciaries to proceed to negotiate for a sale or merger of the business so that all the stock of Dial Shoe Company, Inc., shall be disposed of. In the event a sale cannot be negotiated and consummated within nine (9) months following the close of the fiscal year during which the losses aggregate Two hundred thousand Dollars ($200,000), then and in that event, I direct my fiduciaries to proceed with liquidation of the business and the distribution of the assets to the stockholders in accordance with their respective rights.

On the date of death, the stock ownership of Dial was as follows:

| | Common Shares Voting | Class A Common[3] Non-Voting |
|---|---|---|
| Abram L. Spector | 1,380 | 2,196 |
| 4601 Frankford Corp.* | 585 | 1,170 |
| Edward M. Spector | 85 | 311 |
| Joanne L. Spector ** | [85] | [311] |
| Mimi P. Spector ** | [85] | [311] |
| Renee Silberman | 85 | 311 |
| Total Shares Outstanding | 2,305 | 4,610 |

\* 100% owned by Abram L. Spector.
\*\* Shares held in the name of Ruth Spector, Custodian for daughters Mimi and Joanne.

Under paragraph 6 of the will the recipients of the remainder of decedent's stock interest in Dial could not dispose of the shares received without first offering to redeem at 105% of par the preferred stock issued in the recapitalization.

At audit, the Revenue Agent determined that, on the date of death, decedent's entire interest in Dial was worth $837,967, and that he had total stocks and bonds worth $1,017,989.00. Plaintiff accepted these determinations. In its claim for refund, however, the taxpayer claimed that the value for adjusted gross estate tax purposes of all stocks and bonds held by the decedent was $1,017,989, and again agreed that decedent's Dial shares were worth $836,967.

### III.

At the retrial, the plaintiff and the defendant each presented an expert witness to testify regarding the value of the widow's shares. Both experts proceeded on the initial assumption for purposes of analysis that Dial would be recapitalized without challenge by the minority shareholders.[4]

3. The book value of the Class A common stock in the decedent's name at the end of the fiscal year immediately preceding the decedent's death was $214.75 per share.

4. This assumption is supported by the record. As the court recognized, the only shareholders who would be disgruntled as a result of the recapitalization are the minor children of the taxpayer. *See* 581 F.2d 1088, n.17. It is uncontradicted that these children have a harmonious family relationship with their mother, widow of the decedent Abram L. Spector, and would not challenge the recapitalization for that reason. Furthermore, their potential loss is insignificant compared with their other's potential gain, *see id.*, a gain from which they would be beneficiaries due to their relationship with their mother. For these reasons the possibility of a legal challenge to the recapitalization is for all practical purposes so negligible as to be nonexistent, and is thus an insignificant factor for purposes of valuation.

The plaintiff's expert began by using a value of $1,085,655 for the entire Company, a figure that was determined by the Revenue Agent upon audit and stipulated to by the defendant in order for me to compute the effect on the minor childrens' shares of a recapitalization. He then arrived at a value of $180 to $188 per share for the widow's shares as follows. Starting with the assumption that the widow's shares would have a value of $157 without special protections under the will,[5] he then stated that he would add on a 20 to 25% premium for the special features of the Dial preferred shares provided for in the will. He based this premium on his opinion that the preferred shareholders, in the event of large losses by the corporation or in the event of arrearages, would be protected by a liquidation of the company. This opinion was based on the assumption that upon liquidation the preferred shareholders would be able to recover the 105% of par value of $214.75 called for under the recapitalization provisions. However, he offered no testimony to show the liquidating value of the company. The liquidating value of Dial, as established by the defendant's expert without challenge, was $192,000. Thus, upon liquidation, the preferred shareholders would have realized less than $90 for their shares. It follows, therefore that plaintiff's expert's 20 to 25% premium is based upon a series of unrealistic assumptions.

Furthermore, plaintiff's expert stated that yield was not an important factor in his analysis. Thus he failed to consider the yields from any preferred shares other than A. S. Beck Shoe Company and Butler Shoe Company, two companies whose preferred shares could not properly be used as comparables because of their thin trading or lack of trading at the date of the decedent's death, and for other reasons discussed below.

The reliability of plaintiff's expert's $180 to $188 per share value was also flawed by his statement that if he had valued Dial on his own, he would have arrived at a $165 figure for the widow's shares using his basic approach.

For all of these reasons, I found unpersuasive the correctness of plaintiff's expert's value of $180 to $188 per share for the widow's shares. My misgivings were further borne out after I heard defendant's expert's testimony. The defendant's expert did not begin with a total value for Dial as his starting point, stating that such an approach was improper. Instead, he first considered the dividend yield per dollar of price for publicly traded preferred shares of companies that were sounder than Dial to arrive at a value for the widow's shares, assuming that the special features of the Dial shares did not warrant any premium over the cumulative feature of the compared companies' stocks. He then determined that no premium should be accorded the widow's shares for the special features provided for in the will as against the cumulative nature of the publicly traded preferred shares. He thereby arrived at a value for the widow's shares of no more than $134.00 per share, assuming in favor of the taxpayer that the widow's shares, if publicly traded, would sell at the average yield of the shares compared. His testimony both supported this approach and cast further doubt upon plaintiff's expert's valuation.

Defendant's expert initially examined publicly traded cumulative preferred stocks of ten publicly traded companies. While the ten preferred stocks did not include preferred stocks of the "blue chip" category, but only more speculative preferred stocks, they nevertheless ranked higher than Dial. Thus, if Dial's preferred shares were publicly traded, the expected rate of dividend yield (dividends divided by market price) would have been at the higher range of the yields for the ten compared shares. The dividend yields of these ten publicly traded preferred stocks ranged from a low of 5.9% per annum to a high of 7.4% per

**5.** Plaintiff's expert did not offer a convincing explanation of how he arrived at this $157 figure, which is equal to the per share value arrived at upon audit for all shares of an unrecapitalized Dial.

annum, with an arithmetic average of 6.5% per annum. Dial's preferred shares, if they were publicly traded, would have therefore called for a yield of at least 7%. This yield, however, would have to be increased by 20% in order to reflect a 20% discount in value based on lack of marketability because the preferred shares were not publicly traded. Thus, the rate of dividend yield would have to be in excess of 8% of market price, which would result in a price of at least $134 per share ($10.74 divided by 8%).[6]

The plaintiff failed in any manner to challenge defendant's expert's determination that a 20% lack of marketability discount was required for Dial's shares. Using a more realistic 7% yield would have resulted in a price of only $153.59–$10.75/.07–for the Dial shares if they were publicly traded. Applying to this a 20% lack of marketability discount would result in a price for the widow's shares of only $122.87 per share. Thus, even if, as contended by the plaintiff's expert's testimony, a 20 to 25% premium could be added for the special features under the will, the price would be only $147.44 to $153.59 per share.

Defendant's expert further stated that Dial's preferred shares (disregarding the special provisions in the will) would be of the highly speculative category and overall would be inferior in quality to the ten compared stocks. He based this opinion of the following: Dial had a poor history of minimal or lackluster earnings and profits, had an otherwise poor financial liquidity, operated in a highly competitive field in a regional area with national companies with far greater financial resources, and would be highly leveraged upon recapitalization. I find this opinion persuasive.

Initially, his testimony concerning the earnings factor was well supported. He began with the tenet that a company's ex-

pected ability to have sufficient earnings to pay dividends would be highly significant in arriving at the value of a preferred stock. He then noted that Dial's five–year average annual earnings were only $41,561 as against the annual preferred stock dividends of $23,579.55 that were to be paid (5% times $214.75 par value per share times 2,196 shares). In addition, he stated that the earnings were erratic, with Dial having suffered a loss of $40,005 in 1963, and Dial had shown no growth in sales during the past five years. Thus, he showed that there was substantial question whether Dial had the ability to pay the preferred share dividends with any degree of continuity. On the other hand, the preferred stock dividend coverage of each of the ten compared companies for the past five years (the period for which figures were available for Dial) was superior to Dial's. The ratio of annual earnings to the annual total preferred stock dividend for each of these companies was superior to Dial's ratio. The preferred stock dividend coverage ratio of the ten companies averaged 8.9% for the past five years whereas Dial's only averaged 1.8%. While Dial showed improvement in this ratio in the latest years this was insufficient to change the low quality of Dial as against the other companies because an investor would be concerned with a sustained history of ability to cover preferred stock dividends. Moreover, Dial's erratic earnings pattern would be a negative factor.

As defendant's expert further testified, Dial's otherwise poor financial liquidity also prevented it from being rated higher. Dial had a relatively poor "current ratio" (the ratio of current assets to current liabilities) of 2.1 to 1. Moreover, this 2.1 to 1 ratio was not as strong as it would appear because 90% of current assets consisted of merchandise inventory, a very negative fac-

---

**6.** This can be illustrated as follows:

Even assuming in favor of the taxpayer that the Dial shares could be sold at a yield of only 6.5% of market price if they were publicly traded (6.5% being the average yield of the ten superior publicly traded stocks compared) the resultant market price as publicly traded shares would be $165 per share (the price which at $10.74 per annum would result in a yield of 6.5% ($165.23 × 6.5% = $10.74). However, this price of $165 would have to be reduced further by a 20% discount for lack of marketability for the Dial shares which were not publicly traded, thereby resulting in a price of $132 per share.

tor because Dial, due to future changes in women's fashions, might be unable to realize full cost for its merchandise.

Further, Dial was in a highly competitive field, and could be forced out of business were a stronger national competitor to enter its geographical area and saturate the market. Dial's business was restricted to a regional area in comparison to a national market that would be less affected by regional market cycles.

Finally, Dial, upon recapitalization, would be highly leveraged with a consequent adverse effect on the preferred shares. In a recapitalized Dial Shoe Company, Inc., 2,196 shares of 5% preferred stock at $214.75 par value each would create additional indebtedness in the amount of $471,591 and would reduce earnings by the amount of $23,580 to be paid as preferred stock cash dividends. Preferred stock would represent 32%[7] of total stockholders' equity (common stock, preferred stock and retained earnings) and this would cause the Company to become highly leveraged. As a result, Dial Shoe Company's preferred stock would not carry a high quality rating. In other words, the total annual preferred stock dividend of $23,579.55 would create a significant drain on the earnings that could be used to avoid stagnation of the Company.[8] Thus less funds would be available for such business expansion as investment in new equipment for existing and prospective stores.

Defendant's expert's opinion that the value of the widow's shares would not exceed the $134 figure was further supported by his testimony that their value would be minimally altered, if at all, by the special provisions in the will. He testified that Dial would yield no more than $192,000 upon liquidation if the company were liquidated at the date of decedent's death, resulting in a yield of less than $90 per share for the widow's shares. This testimony was based on the following analysis:

The merchandise inventory of $1,851,741,[9] consisting primarily of shoes, was of a nature that would be highly susceptible to style and fashion changes and would bring no more than 50% of book value upon liquidation of the Company. This would reduce the net worth of Dial by at least $900,000. In addition, there would be selling costs in liquidating the merchandise totaling 20% of the realizable value of approximately $900,000, or an additional $180,000 reduction against the net worth of Dial. The net worth would further be reduced by the fact that $213,000 in leasehold improvements, net of accumulated depreciation, would yield nothing upon liquidation. This analysis, which concluded that Dial would have a net worth upon liquidation of no more than $192,000, can be summarized as follows:

| | |
|---|---|
| Starting net worth | $1,485,000 |
| Less inventory adjustment | 900,000 |
| Less 20% sales expenses to liquidate merchandise | 180,000 |
| Less leasehold improvement adjustment (net of accumulated depreciation) | 213,000 |
| Net liquidating value | $ 192,000 * |

* Amount available per preferred share ($192,000 divided by 2,196 shares): $87.43.

In light of this analysis, the provisions of the will which called for placing control in the holder of the preferred shares upon two quarters' of arrearages was of no value. The right to liquidate Dial would result in less than $90 per share, which would be less than the $134 per share value otherwise determined. Further, the liquidation value of the company would be even lower than $192,000 upon its falling in arrears in mak-

---

7. Dial's 32% ratio of preferred shares to stockholder equity was generally poorer than the ratios for the ten compared companies.

8. In this regard, Dial had already shown signs of stagnation in that its sales had not grown over the past five years even though it had retained its earnings rather than paying out dividends to its common stock shareholders.

9. Year end figures were used because interim figures are generally prepared for management's internal purposes and thus are not generally as accurate or reliable. Changes reflected by the interim statement, such as an increase in recently acquired merchandise between January 1, 1966 and April 30, 1966, would not be sufficient to materially alter the appraisal of liquidating values.

ing dividend payments because its financial picture would have necessarily worsened. Similarly, the provision requiring Dial's sale, merger or liquidation upon its sustaining $200,000 in losses in a fiscal year would be of no value because Dial would also be in a significantly deteriorated financial condition upon occurrence of such an event. Clearly, therefore, the provision that the shares were to be paid 105% of par value upon liquidation or merger was a meaningless protection if there would be insufficient funds to pay even $90 per preferred share in such an event.

In any event, purchasers of preferred shares generally do not look to liquidating value to protect their investment, and in light of the foregoing, this would be no different in the case of Dial Shoe. Rather, they buy preferred shares based on the fixed dividend yield of the company, the company's history of earnings and profits, and overall financial stability and expected ability to sell the shares at or near the purchase price. As discussed above, these factors in the case of Dial cast significant doubt upon the validity of plaintiff's expert's $180 to $188 figure.

Finally, as noted above, plaintiff's expert based his opinion in part on comparisons with preferred shares of other shoe companies. However, as defendant's expert showed, those companies were not proper comparables. The companies mentioned were Edison Shoe Company (Edison), Butler Shoe Company (Butler), and A.S. Beck Shoe Company (A.S. Beck).

Edison was a "blue chip", or vastly superior, preferred stock from Dial or the ten companies with which Dial was compared, and thus could not be validly used as a comparable. Edison had a superior current ratio of 6 to 1 versus Dial's 2.1 to 1, had nearly 50% of its current assets in cash whereas only 8% of Dial's current assets were in cash, and had a much more impressive earnings record. Furthermore, Edison's outstanding preferred shares called for payment of only $165,750 per year out of the total earnings of $6,378,680, for an extremely secure preferred stock dividend coverage ratio, for the latest year, 1965, of 38.48 to 1 in contrast to 5.3 to 1 for Dial.

Butler in fact had no trading on or near the valuation date and, moreover, was vastly superior to Dial. Its current ratio was 3.46 to 1 versus 2.1 to 1 for Dial, it had a favorable earnings record in contrast to Dial, 31.9% of its current assets were in cash versus 8% for Dial, and, most significantly, its preferred share dividend coverage ratio for the latest year, 1965, was 69.69 versus 5.3 for Dial.

A.S. Beck was not usable as a comparable because it had a thin, almost non–existent, trading on an extremely small volume of shares, and its most recent sales had shown an erratic 6 point swing in price. Moreover, A.S. Beck had recently started to record profits, thereby starting to wipe out accumulated losses that had resulted in dividends not being paid for four years. Thus, if the thin trading figure were in fact accurate, the figures would necessarily reflect speculation on not only prospective payment of future dividends, but also payment of the four years of accumulated dividends in arrears.

For all of these reasons, I find plaintiff's expert's opinion that the widow's shares were worth $180 to $188 per share thoroughly unconvincing. Thus plaintiff has failed to establish by a preponderance of the evidence that the widow's shares are worth more than $157 per share. Because plaintiff has "the burden in a refund suit of proving not only entitlement to a refund but also the amount of the entitlement," *Tunnell v. United States, supra,* its claim for a refund as initially presented must fail as a matter of law. Further, because plaintiff has failed to demonstrate the factual predicate of its claim, that the widow's shares were worth more than $157 per share, it may not now rely on a different ground not stated in its claim for refund, *Provident National Bank v. United States, supra,* 581 F.2d at 1084 nn.8, 9, and, indeed, inconsistent with statements in its claim for refund, that the decedent's Dial shares were worth less than the figure arrived at upon audit and that thus the decedent's adjusted gross estate was less than arrived at upon audit. *United States v. Felt & Tarrant*

*Mfg. Co.,* 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); *Stoller v. United States,* 444 F.2d 1391 (5th Cir. 1971); 26 C.F.R. § 301.6402–2.

The foregoing discussion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. Accordingly, judgment shall be entered in favor of defendant.